**D.S. MAGAZINES, INC., Plaintiff,**

**v.**

**WARNER PUBLISHER SERVICES
INC., Defendant.**

**No. 85 Civ. 1877 (EW).**

United States District Court,
S.D. New York.

Aug. 7, 1986.

See also, 623 F.Supp. 624.

Michael F. Dennis, Mineola, N.Y., for plaintiff.

Weil, Gotshal & Manges, New York City, for defendant; Robert G. Sugarman, Helene D. Jaffe, R. Peyton Gibson, Evie C. Goldstein, Harris J. Yale, Jonathan M. Polk, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff D.S. Magazines, Inc. ("D.S."), a New Jersey corporation, commenced this diversity action against Warner Publisher Services Inc. ("Warner"), a New York corporation and wholly-owned subsidiary of Warner Communications, Inc. D.S., a publisher of magazines catering to the "teen

fan," "black teen fan," and "entertainment/personality" audiences, alleges that Warner, a magazine distributor, breached the contracts between the parties and committed fraud. Warner denies D.S.'s allegations and counterclaims for breach of contract, return of monies advanced to D.S., and fraud.

The case was tried to the Court, in a trial that took 20 days, during which 23 witnesses testified, accumulating a trial transcript of 2,898 pages, and thousands of exhibits were received into evidence. Since the trial was to the Court, some testimony and a number of exhibits which include obvious hearsay were nonetheless received in an effort to expedite the trial. The Court repeatedly observed that its determination would be based only upon relevant and material evidence.[1]

Based upon a reading of the Court's contemporaneous trial notes, a close re-reading of pertinent portions of the trial record, the exhibits, the demeanor of the witnesses and an evaluation of their credibility, the Court makes the following findings of fact and conclusions of law.

## BACKGROUND

To put matters in perspective, a brief description of the magazine publishing industry is necessary. The chain of distribution for magazines sold on newsstands—as opposed to those mailed directly to subscribers—consists of a publisher, a national distributor, wholesalers and retailers. The publisher produces the magazine and is responsible for its editorial content. The publisher either distributes the magazine itself or it contracts with one of the thirteen national distributors who arranges for distribution of the magazines from the printer to the wholesalers, who in turn distribute the magazines to the retailers. The publisher, in consultation with its national distributor, determines the total number of copies of each title to be printed each month, referred to as the "print order."[2]

In addition to arranging for distribution to wholesalers, the national distributor performs other functions, characterized by Warner as a marketing function and a financial function. The marketing function consists of advising the publisher on the most effective methods for maximizing sales of the magazines and assisting the publisher in achieving maximum distribution of its magazines by monitoring the wholesalers and retailers and by attempting to persuade the wholesalers to increase the number of copies of the magazines they will distribute to their retailers. The national distributor employs a force of field representatives who are responsible for maintaining contact with the wholesalers and visiting the retailers. The field force reviews the sales history of the magazines and of the competitors' magazines, attempts to increase the number of retailers receiving the magazines, insures that the magazines are being received by the wholesalers and retailers on time and suggests to the publisher how many copies of the magazines the wholesalers should receive ("allotments"). In addition to this ongoing work, the field representatives perform special tasks coordinated by the national distributor's home office and report to the national distributor's home office on both the ongoing and special work performed for the publisher.

The financial function consists of advancing to the publisher contractually agreed upon amounts upon shipment of the magazines from the printer to the wholesalers. The advances, calculated as a percentage of projected gross billings to wholesalers, allow the publisher to defray its publishing costs. In effect, the distributor serves, to a limited extent, as a factor or a banker to the publisher. At the end of each month, Warner bills the wholesalers for the maga-

---

1. *See Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 199 n. 6 (S.D.N.Y.1978), *aff'd mem.,* 610 F.2d 806 (2d Cir.1979) (citing cases).

2. Tr. at 1399, 1467.

zines that went on sale that month.[3] Then, approximately three months after the issue of the magazine goes "off sale,"[4] the national distributor calculates net sales by adding up the total number of copies of the magazine distributed to the wholesalers and deducting from the total the number of unsold magazines returned by the wholesalers.[5] The national distributor then deducts the advances paid to the publisher, the distributor's commission—in this case 5% of net sales—and any contractually agreed upon expenses. If there is any balance due to the publisher, it is remitted to it. If the amount remaining after deduction of commissions and expenses is insufficient to enable the distributor to recoup the advances paid to the publisher, an "overdraft" is created. Under the contracts at issue here, overdrafts could be deducted from the advances due on subsequent issues or from the proceeds of the sales of subsequent issues, or payment could be demanded from the publisher.

The third link in the chain is the wholesaler. There are approximately 450 wholesalers in the country, each of whom serves a particular geographic region, by delivering the magazines to the retailers. Most wholesalers handle between 2500 and 3000 magazine titles.[6] With a few exceptions, there is only one wholesaler for most magazines in a particular geographic area.

The wholesaler receives the magazines in bulk directly from the printer. The wholesaler determines the number of each magazine title to be shipped to its retailers, makes up the individual delivery bundles, transports these bundles to each retailer, and picks up the unsold magazines from each retailer. Some wholesalers are required to return all unsold copies to the distributor for destruction, while others are authorized to destroy the magazines on their own premises and submit an affidavit attesting to the number of copies destroyed. The wholesaler keeps records, usually on a computer, of the sales of each magazine by each retailer. Based on these sales records, the computer is programmed to determine how many copies of each magazine to deliver to each retailer. If a retailer fails to sell any copies of a particular magazine for a few consecutive months, the computer automatically removes that retailer from the distribution list for that magazine.[7]

Wholesalers, like all other members of the distribution chain, attempt to maximize their profits. Because they incur costs in retrieving unsold copies and destroying them and in delivering more copies than are sold, if the wholesaler is allotted more copies of a magazine than the wholesaler believes is appropriate to achieve his desired sales efficiency, the wholesaler may refuse to deliver the excess copies to the retailers (referred to as "withholding") or may return the magazine before its off-sale date (referred to as "prematuring").

The final link in the distribution chain for magazines sold on newsstands is the retailers. There are approximately 200,000 retailers in the United States and Canada, of which approximately 150,000 have "mainline" racks which can display several magazines at one time.[8] Other retailers have small displays at the checkout counter, while others offer only *TV Guide*. Many retail chain stores have "restricted lists" containing the names of the magazines that the retailers in that chain are "authorized" to sell by the parent company. There are

---

**3.** Wholesalers are given a discount of 40% off the cover price, of which the wholesaler retains half and half goes to the retailer.

**4.** The date selected by the publisher after which the issue of the magazine should no longer be sold because the next issue is being distributed.

**5.** In this case, wholesalers were required to ship returns of unsold monthly magazines within 120 days after the off-sale date in order to get credit for the magazines.

**6.** *See* Tr. at 1399, 1503, 1832–33.

**7.** The process of monitoring the sales history of each retailer and determining the number of copies to be distributed to the retailers is called "order regulation." *See* Tr. at 1408, 1505, 1507, 1833–37.

**8.** *See* Tr. at 1401, 2295.

approximately 607 chains in the United States and Canada representing 76,000 retailers.[9]

Retailers decide how many magazines they want to sell, the number of copies they want to receive, and how the magazines will be displayed. Publishers pay a fee to some retailers for making space available in their stores to display the publisher's magazines, referred to as a "Retail Display Allowance" ("RDA"). Publishers contract with the national distributor or with independent agencies to audit and pay the Retail Display Allowances. In this case, D.S. retained a third-party, Progressive Magazines, Inc., to monitor RDA payments.

*The Contracts Between D.S. and Warner*

A central issue in this case is the meaning of paragraph 7(f) of the parties' contracts. It is desirable, therefore, to review the history of the contracts, particularly as it relates to the disputed provision.

In 1978, Warner's predecessor, Independent News Company, Inc. ("Independent"), entered into a contract with D.S.'s predecessor, The Laufer Company ("Laufer"). An annex to the typewritten contract provided: "Every title to receive a complete distribution by Independent personnel at least three times a year in the A Towns and at least two times a year in the B Towns. ('Distribution' to be defined as dealer by dealer review with appropriate allotment adjustments effected)."[10] The 1981 contract between Warner and Laufer, a printed form contract, eliminated this provision and replaced it with paragraph 7(f), in which Warner agreed "[t]o have Warner's field personnel monitor the sales performance of the Publication(s) through periodic check-ups of wholesale distributors, such check-ups to take place at least three times a year in the A Towns and at least two times a year in the B Towns."[11] The con-

tract did not define "periodic check-ups of wholesale distributors."

In August 1982, D.S. purchased four magazine titles from Laufer—*Tiger Beat, Tiger Beat Star, Right On,* and *Daytimers*—and assumed the two-year contract with Warner for the distribution of all the titles except *Right On,* which was distributed by another company. The contract was due to expire on June 30, 1983.

On May 16, 1983, D.S. and Warner entered into two contracts for the distribution of plaintiff's magazines. One contract was for the exclusive distribution of D.S.'s *Tiger Beat, Tiger Beat Star* and *Daytimers* publications and was to expire on June 30, 1985.[12] The second contract, effective August 5, 1983, was for the exclusive distribution of D.S.'s *Right On* and *Class* publications and was to expire on August 4, 1985.[13] Both contracts contained paragraph 7(f), the "periodic check-ups of wholesale distributors" provision contained in the 1981 contract assumed by D.S. On March 7, 1985, D.S. terminated both contracts[14] and announced the next day that it had replaced Warner with another national distributor, Select Magazines, Inc. ("Select").

## DISCUSSION

Against the foregoing description of the industry and the parties' relationship, we turn to the parties' claims. D.S. contends that Warner breached the contracts in two ways. First, D.S. alleges that Warner breached paragraph 7(f) of the contracts which required Warner to have its field personnel "monitor the sales performance of the Publication(s) through periodic check-ups of wholesale distributors, such check-ups to take place at least three times a year in the A towns and at least two times a year in the B towns." Second, D.S. contends that Warner breached its implied

9. Tr. at 2296.

10. Defendant's Exh. 1648.

11. Plaintiff's Exh. A.

12. Plaintiff's Exh. C.

13. Plaintiff's Exh. B.

14. *See* Plaintiff's Exh. 85–GG.

duty to use its best efforts in performing distribution work; that the precipitous decline in the sales of D.S.'s magazines during the contracts' period was due to Warner's failure adequately to perform field work.

Warner vigorously denies these contentions. As to the first claim, Warner contends that the contractual requirement to perform "periodic check-ups of wholesale distributors" was fulfilled, as that term is defined by Warner. Warner also contends it substantially performed its obligations and that to the extent D.S. lost sales, it was the result of D.S.'s policies, practices and unilateral decisions, not of actions taken by Warner. Warner contends that D.S.'s termination of the contracts was not justified and, therefore, it is entitled to prevail on its counterclaim for breach of contract. In its second counterclaim, Warner seeks to recover monies advanced to D.S. in excess of the amount it received from the wholesalers, referred to as "overdrafts."

Both parties also claimed that the other committed fraud. D.S. offered no proof at trial to sustain its fraud claim, apparently abandoning it as evidenced by the absence of any mention of the claim in its post-trial papers. For its part, Warner alleges that D.S. fraudulently induced Warner to pay advances in February 1985 that Warner was not obligated to pay. Warner alleges that D.S. misled it into believing the contracts would be renewed, but that D.S. never had any intention of renewing the contracts. D.S. denies making any misrepresentations and argues that Warner was contractually obligated to pay the advances.

## I. Breach of the Contracts

The parties do not dispute the existence of valid and binding contracts. The only issues raised are which party breached the contracts and what damages, if any, were caused by the breach.

### A. *Paragraph 7(f)*

As noted previously, D.S. seeks to recover for Warner's alleged failure to perform "periodic check-ups of wholesale distributors ... at least three times a year in the A towns and two times a year in the B towns." The provision is not defined in the contracts and the parties urge very different interpretations.

The word "check-up," when used by itself, means counting the number of copies at the retailer or wholesaler level as a basis for making sales projections or it can mean a visit by a field representative to a retailer to insure that the magazine is being displayed properly.[15] However, "periodic check-ups of wholesale distributors," unlike "check-up," is not a term of art in the industry. Accordingly, there is no industry custom and practice which would give guidance as to the meaning of the phrase used in the parties' contracts.

D.S., relying primarily on the testimony of its president, Michael Edrei, contends that the clause obligated Warner to perform three national distribution assignments a year in the A towns and two national distribution assignments a year in the B towns.[16] National distribution assignments are instructions from the distributor's home office to its field force to perform distribution work in specified cities for specified magazine titles. The scope of the work to be performed and the cities in which it is to be performed are agreed upon by the publisher and national distributor. The distribution work generally consists of visits by the field representatives to the wholesalers to gather data on such things as allotments, the number of available dealers, and sales history. The data is then compiled on a national basis by the distributor's home office.[17] According to

---

**15.** *See* Testimony of William D. Smith, tr. at 421–22, 429; Testimony of Robert Matthiessen, tr. at 1658–60, 1670; Testimony of David Miller, tr. at 2322–23.

**16.** A towns are larger cities in which Warner representatives are based and B towns are cities with a lower sales volume. *See* Testimony of Mary McGrath, tr. at 2006–07.

**17.** *See, e.g.,* Defendant's Exhs. 43, 158, 169, 318, 339, 1765.

plaintiff, national distribution assignments are used to determine the appropriate print order and allotments to wholesalers, to make adjustments in allotments to reflect seasonal fluctuations in a magazine's sales, and to increase the number of dealers receiving plaintiff's magazines.

Edrei, who negotiated the contracts at issue on behalf of D.S., testified that Sol Himmelman, then the president of Warner, proposed to him in April 1983 that D.S. renew the contract it had assumed from Laufer. On April 22, 1983, Himmelman, Edrei and others met at D.S.'s offices in Creskill, New Jersey, to conduct what is referred to as the 1983 business review. During the meeting Warner's representatives presented Edrei with a written document [18] and made an oral presentation describing the services Warner had performed during 1982 and its proposed activities for the upcoming year. The document states that Warner performed "4 National assignments" during 1982.[19]

Subsequent to the meeting, Himmelman provided Edrei with a draft contract. According to Edrei, the draft did not indicate what Warner's commission would be, did not specify the number of periodic check-ups of wholesale distributors Warner would perform, and added a provision giving Warner a right of first refusal with respect to the distribution of any new publications produced by D.S. Edrei and Himmelman continued their negotiations with respect to these provisions in New York. Edrei testified that when Himmelman requested an increase in Warner's commission from 5% to 6% on the ground that

Warner was distributing fewer magazines for D.S. than it had for Laufer, Edrei agreed to make Warner the national distributor for the *Right On* titles which had been distributed by Kable News Company.

Edrei stated that he also told Himmelman that D.S. wanted "exactly the same number of distributions as the Laufer Company had before. And as the business review represented." [20] According to Edrei, he and Himmelman "agreed on three distributions" [21] and Himmelman told him that paragraph 7(f) was the provision of the contracts that required Warner to perform the national distribution assignments.[22] Finally, the parties executed the written agreements containing paragraph 7(f), with its provision for "periodic check-ups of wholesale distributors," the subject of the parties' controversy.

In support of its interpretation of the disputed provision, plaintiff notes that with the exception of Warner's current president, Franklyn Rodgers, none of Warner's witnesses recalled reading the contracts prior to this litigation. Therefore, plaintiff argues, they could not have known whether they were fulfilling their contractual obligations.

Warner, relying on the testimony of its executive vice president for circulation, Robert Matthiessen, contends that "periodic check-ups of wholesale distributors" means ongoing distribution work performed throughout the year.[23] Warner points to the fact that Edrei was the only witness who asserts he had heard the phrase "periodic check-ups of wholesale

---

**18.** Plaintiff's Exh. BB.

**19.** *Id.* at 1.

**20.** Tr. at 48–49.

**21.** Tr. at 49.

**22.** Tr. at 49–50.

Q. Did you have any conversations with Mr. Himmelman as to the meaning of the term?

A. Well, at the time we didn't. We agreed on three distributions and then I was supposed to get another draft of the contract later on which I received a few days later.

I called him and I said, "What is this periodical checkups three times a year and all that? You promised me at least three distributions a year as you represented in the business review a few days before."

He said, "This is it. That paragraph [7(f)] covers you for the distribution work."

**23.** *See* Testimony of Robert Matthiessen, tr. at 1522–23, 1645–46, 1670; *see also* Testimony of Franklyn Rodgers, tr. at 1446–49.

distributors" used to describe national distribution assignments.

Warner argues that national distribution assignment has a commonly understood meaning in the industry and that if it had intended to obligate itself to perform three national distribution assignments a year in the A towns and two in the B towns, its printed form contract would have specifically so defined the clause. Both parties rely in part on the 1978 contract between D.S.'s predecessor, Laufer, and Warner's predecessor, Independent News Company.[24] As noted previously, that contract called for the national distributor to provide "a complete distribution" for each title three times a year in the A towns and two times a year in the B towns, with "distribution" defined in the contract as "dealer by dealer review with appropriate allotment adjustments effected." Warner contends that the substitution in 1981 of paragraph 7(f) for the above-quoted provision in the 1978 contract supports its position that national distribution assignments were not contemplated by the parties under the terms of paragraph 7(f). Plaintiff in response argues that substitution of "periodic check-ups" was of no significance, but that Warner simply changed a few words in its printed form contract and despite the changes, it was under the same obligation it had under the 1978 contract.[25]

Finally, Warner contends that the credibility of Edrei's interpretation of paragraph 7(f) is undermined by the fact that, with the exception of one document,[26] the authenticity of which is vigorously disputed, D.S. never stated in writing that Warner had or was failing to fulfill its contractual obligation to perform national distribution assignments. Warner notes that William Smith, D.S.'s consultant who was retained to monitor Warner's performance and who sent dozens of memos and letters to Warner's account executives criticizing Warner's performance, never once raised the issue and that when Edrei submitted an affidavit to the Court in opposition to defendant's motion for an attachment in March 1985, he listed 21 complaints about Warner's performance never mentioned Warner's alleged failure to perform national distribution assignments. Warner also alleges, but plaintiff denies, that no D.S. employees ever orally complained about Warner's failure to fulfill its obligations under paragraph 7(f), as defined by D.S.

It is against this conflict in testimony and upon a lack of corroborated or substantive evidence that the Court is called upon to decide whether Warner breached paragraph 7(f) of the contracts. The answer to this question depends entirely upon the intent of the parties with respect to the disputed clause. If, as plaintiff alleges, Warner was obligated to perform three national distribution assignments in the A towns and two in the B towns, Warner clearly breached its promise. Similarly, if the provision is interpreted to mean that Warner was required to "monitor the sales performance" of D.S.'s magazines through "periodic check-ups" as defined by Warner, the evidence shows (and plaintiff made no attempt to rebut) that Warner fulfilled its obligation. Essentially, the issue boils down to a resolution of the conflict between the testimony of Edrei and that of Matthiessen and Warner's circumstantial evidence offered in support of its position.

■ Neither side deposed nor called Himmelman to testify as to his negotiations with Edrei in the spring of 1983. At the time of the trial, he was no longer associated with Warner. In fact, Himmelman was the president of Select at the time D.S. negotiated with Select to replace Warner upon D.S.'s termination of the contracts. Either party could have compelled Himmelman's testimony. Accordingly, the Court declines to draw an adverse inference against either Warner or D.S.[27]

---

**24.** Defendant's Exh. 1648.

**25.** *See* Tr. at 2858–59, 2880.

**26.** Plaintiff's Exh. 84–U.

**27.** *Cf. United States v. Evanchik,* 413 F.2d 950, 953–54 (2d Cir.1969); *United States v. Dibrizzi,* 393 F.2d 642, 646 (2d Cir.1968); *United States v. Armone,* 363 F.2d 385, 404–05 (2d Cir.), *cert. denied,* 385 U.S. 957, 87 S.Ct. 398, 17 L.Ed.2d

█ The question of whether paragraph 7(f) of the contracts required Warner to perform national distribution assignments is close. The Court finds, however, that because plaintiff bears the burden of proof by a fair preponderance of the evidence, plaintiff has failed to prove that its interpretation of the contract was what the parties intended and, therefore, that Warner breached the contracts.

Edrei, on whose testimony plaintiff rests its case, was not an entirely credible witness. He was glib and ready with self-serving answers, evasive at times and less than forthright on cross-examination. His testimony was calculated and designed to boost plaintiff's case. He volunteered information to support plaintiff's position and stubbornly evaded questions when it appeared to undermine D.S.'s position.

While plaintiff was not legally required to state in writing during the contracts' period that Warner was failing to perform national distribution assignments, the lack of written complaints by D.S. undermines the credibility of plaintiff's position. Even assuming that the disputed letter from Kenneth Gudaitis, D.S.'s circulation director, to Robert Matthiessen of Warner dated February 23, 1984 was mailed to Matthiessen,[28] plaintiff's conduct throughout the term of the contracts leads to the conclusion that it would have expressed its position repeatedly, orally *and* in writing— yet it failed to do so. Despite the steady stream of correspondence from Smith, Gudaitis and Edrei to Warner[29] and Edrei's own testimony that the alleged obligation

to perform national distribution assignments was "the heart of the contract,"[30] D.S. never again mentioned that Warner was contractually obligated to perform such assignments.[31]

In connection with both its April 1983 and December 1984 business reviews, Warner submitted a report to D.S. outlining its proposals for the upcoming year, including proposed national distribution assignments. Neither of these reports stated that Warner planned to conduct such assignments three times a year in the A towns and two times a year in the B towns for each of D.S.'s titles, as D.S. claims Warner was obligated to perform. Yet, despite this, no one from D.S. objected during those meetings that Warner's proposals were insufficient in light of the alleged contractual obligation.[32] This strongly suggests, and the inference is warranted, that plaintiff recognized and accepted a practical construction of paragraph 7(f) as contended for by Warner. It is contrary to common experience and defies common sense that Edrei, an experienced and articulate businessman, would have stood by, as he did, if plaintiff's now contended for construction was in fact his view at the time of these events, particularly the business review meetings.

No document introduced into evidence, including the 1983 business review which Edrei claims was one of the bases for his interpretation, equates "periodic check-up of wholesale distributors" with national distribution assignments or national assign-

---

303 (1966); *United States v. Llamas,* 280 F.2d 392, 393–94 (2d Cir.1960); *United States v. Antonelli Fireworks Co.,* 155 F.2d 631, 638–39 (2d Cir.), *cert. denied,* 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946).

**28.** Plaintiff's Exh. 84–U. The Court notes that with the exception of Edrei, none of the copy recipients of the letter, including plaintiff's consultant Smith, recalled seeing the letter prior to the litigation.

**29.** *See* Plaintiff's Exhs. 83–G, –H, –J, –K, –L, –M, –T, –U, –V, –W, –X, –Y, –AA, –BB, –CC, –EE, –FF, –GG, –HH, –II, –LL, –VV, –WW, –XX, –ZZ, –AAA, –BBB, –CCC, –DDD, –FFF, –GGG, –JJJ, –KKK, –LLL, –MMM, –NNN, –OOO, –SSS, 84–A,

–B, –H, –I, –K, –L, –N, –O, –R, –S, –T, –V, –W, –X, –Y, –Z, –AA, –BB, –DD, –FF, –II, –KK, –LL, –PP, –QQ, –RR, –TT, –XX, –YY, –ZZ, –AAA, –FFF, –LLL, –NNN, 85–F, –G; Defendant's Exhs. 97, 102, 163, 281, 298, 315, 1754.

**30.** Tr. at 189–90.

**31.** D.S. did refer to distribution assignments in some correspondence, *see* Plaintiff's Exhs. 84–S, 84–DD, but not to an alleged obligation to perform such assignments.

**32.** *See* Testimony of Michael Edrei, tr. at 203–04; Testimony of Robert Matthiessen, tr. at 1556–59; Testimony of Denise Bove, tr. at 1726.

ments.[33] National assignments, referred to by Warner as "ACB's" or "ACU's," are not limited to national distribution assignments. Assignments can also be marketing assignments in which Warner's field representatives are instructed to solicit authorizations from chain stores in an effort to increase the number of dealers receiving the publisher's magazines,[34] or categorical analyses in which the representatives gather sales data to determine the type of retail outlet in which a magazine sells best.[35] Since "national assignment" is a term with a commonly understood meaning in the industry, if the parties intended that Warner be required to perform a certain number of national distribution assignments it is singular that experienced persons in the industry did not so indicate in unambiguous language. Its significance was such that it could not have been overlooked if the parties intended "national assignments."

Plaintiff has not proven that the only way Warner could "monitor the sales performance of the Publication(s) through periodic check-ups of wholesale distributors" was by performing national distribution assignments. Indeed, the evidence shows that Warner, through its ongoing distribution work and its national assignments, monitored the sales performance of D.S.'s magazines by conducting periodic check-ups of wholesale distributors. Plaintiff made no attempt to meet its burden of proving that these periodic check-ups of

wholesalers, as defined by Warner, did not occur at least three times a year in the A towns and two times in the B towns. Accordingly, plaintiff's claim that Warner breached paragraph 7(f) of the contracts is dismissed.

### B. *Implied Duty to Perform in Good Faith*

It is undisputed that sales of D.S.'s magazines declined significantly during the term of the contracts. D.S. contends that the decline was caused by Warner's breach of its implied duty to use its best efforts [36] as the exclusive distributor of D.S.'s magazines.[37] Warner not only categorically denies plaintiff's charge, but asserts that the drop in sales was due to D.S.'s own shortcomings.

Other than to assert its claim, plaintiff has offered no probative evidence to sustain its burden of proof. To the contrary, the evidence shows that Warner's field representatives performed both ongoing and special distribution activities on behalf of D.S. throughout the term of the contracts. The representatives submitted weekly reports to Warner's home office summarizing sales, dealer and allotment data, and reporting on their efforts to increase sales of D.S.'s magazines and on work performed pursuant to national assignments.[38] Warner introduced into evidence hundreds of documents attesting to some of the work it

33. *See* Plaintiff's Exhs. BB (1983 business review); CC (1984 business review).

34. *See* Testimony of Michael Reid, tr. at 2299–2300.

35. *See* Testimony of Robert Matthiessen, tr. at 1518.

36. Under New York law, a duty of good faith is implied in every contract. *See Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980); *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 923 n. 8 (2d Cir.1977); *Van Gemert v. Boeing Co.*, 553 F.2d 812, 815 (2d Cir.1977); *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 770 (2d Cir.1975); *Teachers Ins. & Annuity Ass'n of America v. Butler*, 626 F.Supp. 1229, 1231 (S.D.N.Y.1986); *Rowe v. Great Atlantic & Pacific Tea*

*Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978); *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163 (1933); *Wood v. Lucy, Lady-Duff Gordon*, 222 N.Y. 88, 118 N.E. 1082 (1917).

37. Paragraph 7(f) is the only express provision of the contracts that D.S. alleged Warner breached.

38. These reports are referred to as Modified Distribution Reports ("MDRs"), Special Distribution Reports ("SDRs"), Initial Distribution Reports ("IDRs"), Chain Contact Reports ("CCRs"), Authorization Account Reports ("AARs"), and Distribution and Sales Reports ("DSRs"). *See* Testimony of Robert Matthiessen, tr. at 1519–20, 1529–36; Testimony of Klaus Gunn, tr. at 2174–77.

did on behalf of D.S.[39] While quantity is not a substitute for quality, there is no evidence to support plaintiff's charge that Warner failed to use its best efforts on behalf of D.S.

In addition to their weekly activities, Warner personnel performed a distribution assignment for the *Right On* titles in 1983, a distribution assignment for the *Tiger Beat* poster calendars in August 1983, a distribution assignment for the so-called mini-mags [40] beginning in late 1983, a distribution assignment for 14 D.S. titles and a separate distribution assignment for the poster calendars in 1984, and a distribution assignment for 12 D.S. titles in early 1985. Warner also performed marketing assignments to increase chain authorizations and a special assignment aimed at reducing withholding by wholesalers. Warner representatives visited chain stores on a continuing basis, in an effort to secure additional authorizations.[41]

D.S. nevertheless contends that Warner failed to use reasonable efforts to promote the sales of plaintiff's magazines. D.S. makes numerous allegations, which largely overlap and fall into two broad categories: Warner failed properly to perform distribution work and thereby failed to add available dealers and to retain those dealers that were receiving plaintiff's magazines; and Warner failed to insure that wholesalers did not withhold or prematurely return or destroy D.S.'s magazines.[42]

■ With respect to Warner's alleged failure to add available dealers, D.S. claims that although its magazines had received authorizations from various chain stores permitting the member stores to sell D.S.'s magazines, the Warner representatives failed to insure that each of the retailers of those chains were added to the distribution lists. D.S. also asserts that Warner failed to add available independent dealers.[43]

D.S.'s claims are without merit. The Town Files show that over the two-year period, Warner added tens of thousands of dealers to distribution.[44] Moreover, obtaining an authorization from a chain's headquarters does not mean that every store in that chain automatically will carry the magazines. Chains often authorize more magazines than individual stores can carry and the final decision is left to the wholesalers and individual retailers.[45] Wholesalers sometimes refuse to permit the national distributor to distribute the magazines to all of the authorized retailers in their region.[46] Independent and chain retailers are independent businesspersons who make the final decision as to which of the available teen magazines they will carry in their stores.[47]

■ While Warner was under an implied duty to assist the publisher in maximizing its sales, which the evidence shows it fulfilled, this does not mean that Warner had an express or implied duty to add *all* available dealers to distribution. It was required to use its best efforts to increase

---

39. *See* Defendant's Exhs. 684 through 1038, referred to as the "Town Files."

40. *Zap, Max, Hit* and *Tuf.*

41. *See* Defendant's Exhs. 177, 195, 197, 210.

42. D.S. also claims that Warner failed to prevent late on-sale dates of its magazines and to perform marketing services. With the exception of a small number of isolated late sales of the magazines, there is no evidence to substantiate either of these claims. Whether considered in isolation or together with the other evidence introduced by D.S., the evidence offered to support these claims does not establish a breach of an implied good faith duty to promote plaintiff's interests.

43. *See* Testimony of Michael Edrei, tr. at 110–13, 854–57.

44. *See* Defendant's Exhs. 684 thru 1038; note 39 *supra.*

45. *See* Testimony of Michael Reid, tr. at 2298–99; Testimony of David Miller, tr. at 2394–96; Testimony of Franklyn Rodgers, tr. at 1404.

46. *See* Testimony of Paul Maibauer, tr. at 2229, 2250.

47. *See, e.g.,* Testimony of plaintiff's consultant, William Smith, tr. at 409.

distribution; it was not required to guarantee an increase in distribution. Warner's approach was to distribute copies of D.S.'s magazines only to those dealers who showed potential for selling the magazines, based either on the demographics of the area or on the sales of competing magazines. Moreover, some wholesalers refused to permit Warner to add retailers to the distribution lists until several months had elapsed if those retailers had failed to sell any copies of D.S.'s magazines in the past.[48] In at least one instance, Warner performed what is referred to as a "saturation test," in which a maximum number of copies of D.S.'s magazines were distributed to the maximum number of retailers in an area for a specified period of time to determine if there was sales potential.[49] The evidence shows that despite saturation of the market, sales remained approximately the same.[50]

D.S. claims that it lost dealers because the Warner representatives failed to insure that those retailers who were selling its magazines remained on distribution. The evidence fails to support D.S.'s claim. The magazine industry is marked by a continuous process of newsstand dealers being added to and dropped from distribution as wholesalers and retailers attempt to maximize their profits. Wholesalers exercise substantial control over which magazines will be sent to which retailers. Their computers, for example, are programmed to delist retailers who fail to sell any copies of a magazine for a few consecutive months.[51] In addition, retailers have a finite amount of display space and they must choose from among thousands of magazines those that will be given preference in the limited space. As sales of most of D.S.'s magazines steadily declined, a loss of dealers was inevitable, regardless of what actions Warner took.

D.S. also ignores the fact that some dealers were lost, at least temporarily, because it failed to pay RDA claims. This occurred with surprising frequency. As noted previously, D.S. entered into Retail Display Allowance agreements with many retailers in which D.S. agreed to pay a fee for display of its magazines. D.S. retained Progressive Magazines, Inc. ("Progressive") to issue the RDA agreements for it, to audit claims for RDA payments filed by retailers, and to issue checks to the retailers using funds provided by D.S.[52] Payment of RDA to retailers is an important obligation of a publisher,[53] and failure to pay RDA, along with poor sales of the magazines, are among the important reasons dealers will stop selling a publisher's magazines.[54] If a publisher's titles are delisted by a retailer, subsequent payment of the RDA claims does not mean its titles will be automatically restored.[55]

The record is replete with a large number of complaints from retailers for D.S.'s late payments of RDA and for its failure to make RDA payments.[56] John Ryan, President of Progressive, testified that it was a common practice for D.S. to make RDA payments one year after the claim was filed and that D.S. often failed to make RDA payments until the retailer com-

---

**48.** See Testimony of Klaus Gunn, tr. at 2184.

**49.** See Testimony of David Moscow, tr. at 1845–49; see also Defendant's Exhibit 1757.

**50.** See Testimony of David Moscow, tr. at 1848; see also Testimony of Kenneth Gudaitis, tr. at 2184–86.

**51.** See Testimony of David Moscow, tr. at 1839; Testimony of Robert Matthiessen, tr. at 1507; Testimony of Franklyn Rodgers, tr. at 1408.

**52.** See Testimony of John Ryan, tr. at 768–72.

**53.** See Testimony of Kenneth Gudaitis, tr. at 729.

**54.** See Testimony of William Smith, tr. at 388–89.

**55.** See Testimony of Michael Reid, tr. at 2303.

**56.** See Defendant's Exhs. 214, 253, 298, 319, 331, 340, 341, 350, 372, 391, 398, 417, 423, 469, 495, 496, 499; see also Testimony of Kenneth Gudaitis, tr. at 729–43; Testimony of John Ryan, tr. at 792–822; Testimony of Mary McGrath, tr. at 2036–38; Testimony of Paul Maibauer, tr. at 2236–39, 2244–45.

plained.[57] Edrei admitted that D.S. sometimes elected not to pay RDA claims, despite the written agreements, because the dealer was considered unimportant or because it was not cost effective to audit the dealer's claims.[58] This was a callous disregard of its obligation. Of the $760,-905.24 in RDA claims submitted to D.S. from the third quarter of 1983 through the first quarter of 1985, D.S. paid only $378,-005.59 prior to the time it terminated the contracts with Warner.[59] No RDA claims had been paid for the third and fourth quarters of 1984 or the first quarter of 1985 by that time.[60]

D.S. claims that while retailers complained about delinquent RDA payments, no retailers actually stopped carrying its magazines. The record demonstrates that this contention is without merit. Although some retailers merely threatened to delist D.S.'s titles,[61] many others actually delisted them.[62] Paul Maibauer, Warner's district sales manager for the Miami-West Palm Beach region of Florida, testified that he personally removed the D.S. logo from 141 Winn-Dixie stores after Winn-Dixie's Pompano division refused to display D.S.'s magazines because D.S. had failed to pay its RDA claims and that he knew that 7–Eleven, Albertson's, and Publix also had ceased to carry D.S.'s magazines as a result of its failure to make RDA payments.[63]

■ Finally, D.S. claims Warner failed to curb withholding and prematuring by wholesalers. Plaintiff's and defendant's witnesses agreed that withholding and prematuring are problems that pervade the magazine industry.[64] Similarly, there is no dispute that these problems affected D.S.'s magazines.[65] Moreover, the evidence does not support D.S.'s claim that Warner ignored the problems or that Warner failed to perform in good faith.

A national distributor's ability to eliminate withholding by wholesalers is limited. It can negotiate with the wholesalers and attempt to persuade them to stop withholding, but it is not in a position to force them to distribute all of the copies they receive from the publisher.[66] Wholesalers are engaged in a labor intensive business in which they attempt to minimize their costs of delivering excess copies, and of picking up and processing unsold copies.[67] Each wholesaler establishes a desired sales efficiency and then programs its computer to distribute only the number of copies needed to achieve that sales efficiency.[68] If the wholesaler is allotted more copies than it finds necessary to achieve its desired sales efficiency, the excess copies are withheld from distribution to the retailers or are

---

57. *See* Tr. at 792, 799; *see also* Defendant's Exhs. 494, 495.

58. *See* Tr. at 260–63.

59. *See* Defendant's Exh. 1800. RDA claims and payments for the first and second quarters of 1983 were outside the contracts' period and therefore not included.

60. *Id.*

61. *See, e.g.,* Defendant's Exhs. 319, 331, 372, 391, 469, 496, 499.

62. *See, e.g.,* Defendant's Exhs. 144, 237, 257, 266, 276, 305, 315, 347, 357, 463. Simply because some chain stores continued to submit RDA claims after sending delisting notices does not mean that each of the stores in the chain continued to carry D.S.'s magazines. *See* Testimony of John Ryan, tr. at 835–36.

63. *See* Tr. at 2236–39, 2244–45.

64. *See* Testimony of William Smith, tr. at 313–14, 399; Testimony of Kenneth Gudaitis, tr. at 719; Testimony of Franklyn Rodgers, tr. at 1410; Testimony of Denise Bove, tr. at 1736; Testimony of David Miller, tr. at 2525.

65. *See* Testimony of Franklyn Rodgers, tr. at 1418, 1433–34, 1462, 2735; Testimony of Robert Matthiessen, tr. at 1637, 1639, 1565; Testimony of Denise Bove, tr. at 1735, 1770–71; Testimony of Mary McGrath, tr. at 2030, 2112; Plaintiff's Exhs. 84–T, 84–X, 84–II, 84–OOO.

66. *See* Testimony of William Smith, tr. at 401; Testimony of David Moscow, tr. at 1841–42; Testimony of David Miller, tr. at 2408–09.

67. *See* Testimony of William Smith, tr. at 313.

68. *See* Testimony of Kenneth Gudaitis, tr. at 725–26; Testimony of Robert Matthiessen, tr. at 1505–06; Testimony of David Moscow, tr. at 1837–38.

prematurely returned prior to the off-sale date.[69]

The evidence shows that Warner's field representatives and home office personnel made repeated requests for cuts in allotments as a way to curb the withholding problem but that many of these recommendations were rejected by plaintiff or its consultant, Smith, who felt that cutting allotments to wholesalers would not solve the problem.[70] D.S. stubbornly refused to reduce its national print order and its allotments despite the declining sales of most of its magazines. The result for those wholesalers whose allotments were not reduced was that the proportion of the magazines they received from the printer relative to the number actually sold increased as sales declined.[71] D.S.'s severe withholding problem was the inevitable result of its own policies.[72]

In an effort to curtail the withholding problem, Warner not only recommended allotment cuts, it also conducted a special division assignment in late 1984 aimed at reducing withholding until a national distribution assignment could be completed in early 1985.[73] Warner instituted its Eight Point Policy[74] and its Affidavit Return Privilege Policy[75] in part to reduce withholding on magazines it distributed, but it was not contractually obligated to institute or enforce either of them. Plaintiff's argument that Warner breached its obligations because it failed to enforce these programs is without merit. Plaintiff offered no support for its contention that Warner represented to it that these programs would

solve the withholding problem or that they would be strictly enforced. Nor is there any evidence that if Warner had attempted to enforce the policies withholding would have been eliminated.[76]

The bottom line is that while D.S. suffered from serious withholding problems, it failed to prove by a fair preponderance of the evidence that Warner failed to fulfill any obligations it might have had with respect to those problems. To the contrary, the evidence suggests that withholding occurred despite Warner's best efforts.

The problem with D.S.'s claim of breach of implied duty is that it ignores the fact that the question for the Court is not whether Warner could have done more or could have performed better, but whether Warner performed sufficiently and reasonably well to meet its duty to act in good faith. In sum, the evidence does not sustain the conclusion that Warner breached its implied duty.

### C. *Causation*

█ Even if Plaintiff had prevailed on its claim that Warner breached its express obligation under paragraph 7(f) to perform periodic check-ups of wholesale distributors or its implied duty to use reasonable efforts, D.S. failed to show that any of Warner's actions caused the decline in sales of its magazines. To the extent fault is to be attributed to a party for the decline of D.S.'s sales, the fault lies with D.S.

In general, D.S. operated without regard for the interests and concerns of the other

**69.** *See* Testimony of Robert Matthiessen, tr. at 1505–06; Testimony of David Moscow, tr. at 1838.

**70.** *See, e.g.,* Testimony of William Smith, tr. at 370; Testimony of Robert Matthiessen, tr. at 1564; Testimony of Mary McGrath, tr. at 1960–61, 1967, 1974, 1977; Testimony of Klaus Gunn, tr. at 2182–83; Testimony of Paul Maibauer, tr. at 2223; Plaintiff's Exhs. 84–L, 84–V, 84–Y, 84–Z, 84–XX.

**71.** In 1984, D.S. printed almost four copies of *Tiger Beat* for every copy sold, while two of its competitors, Sterling Magazines and McFadden, printed approximately two copies of their teen

magazines for every one sold. *See* Defendant's Exhs. 1633, 1635, 1636, 1637.

**72.** *See* Testimony of David Miller, tr. at 2406–08; *see also* Testimony of David Moscow, tr. at 1838; Testimony of Franklyn Rodgers, tr. at 1462–63.

**73.** *See* Plaintiff's Exhs. 84–000; A–100.

**74.** Plaintiff's Exh. D–1.

**75.** Exh. 84–JJ.

**76.** *See* Testimony of William Smith, tr. at 386; Testimony of David Moscow, tr. at 1892–93; Testimony of David Miller, tr. at 2410–12, 2516.

major participants in the magazine industry. As the Court discussed above, D.S. exhibited a total disregard for its agreements to make timely RDA payments to retailers. Wholesalers' repeated requests for reduced allotments went unheeded. Shortly after launching its four mini-mags, D.S. unilaterally reduced the discounts it offered to wholesalers on those publications from 45% to 40%, without advising the wholesalers.[77] Instead of fostering good relations with wholesalers, its acts and conduct resulted in hostile relations.

It is not disputed that D.S. made numerous last minute changes in its production schedule, bipad codes,[78] titles of its publications, cover prices of its publications, and allotments to wholesalers.[79] D.S. changed the editorial format of two of its major publications, *Tiger Beat* and *Daytimers*, without notifying Warner sufficiently in advance to enable Warner to conduct studies aimed at maximizing distribution and sales efficiency, and without notifying wholesalers and retailers.[80] On two occasions, D.S. even ignored the interests of its consumers by republishing identical issues of its magazines, changing only the date on the cover.[81]

D.S.'s claim that Warner's alleged breaches of the contracts caused it to lose sales is further undermined by the fact that D.S. was losing dealers before it entered into the contracts at issue.[82] More importantly, the evidence shows that sales of teen magazines experienced a general decline in 1984.[83] D.S. undercut its own position in that market by expanding its product line with the addition of dozens of new titles that competed with each other for the limited space on retailers' display racks and for purchasers.[84]

Finally, the evidence shows that although Warner was the exclusive distributor for all of D.S.'s magazines and each of its magazines was handled by the same field representatives, sales of *Right On* magazine experienced only a slight decline during the same period that sales of the teen titles declined sharply.[85] D.S.'s argument that the difference can be attributed solely to the fact that three national distribution assignments were performed by Warner for *Right On* lacks support in the record. Three national distribution assignments were performed for D.S.'s mini-mags,[86] yet sales of those magazines were erratic and generally declined.[87] Plaintiff failed to meet its burden of proving that Warner breached the contracts and, accordingly, its claim is dismissed.

77. *See* Testimony of Mary McGrath, tr. at 2026–30; Testimony of Robert Matthiessen, tr. at 1561–62; Defendant's Exhs. 383, 406, 413, 431, 434.

78. Bipad codes are computer codes stamped on the covers of the magazines which are used to indicate prices and other information and to track sales of the magazines. *See* Testimony of Denise Bove, tr. at 1691.

79. *See* Defendant's Exh. 1764; *see also* Testimony of Denise Bove, tr. at 1699–1706, 1786–87; Testimony of Mary McGrath, tr. at 1978–92; Defendant's Exhs. 114, 116, 118, 130, 141, 145, 147, 179, 182, 198, 199, 235, 297, 353, 367, 395, 416.

80. *See* Testimony of David Miller, tr. at 2363–74; Testimony of Denise Bove, tr. at 1688–95; Testimony of Robert Matthiessen, tr. at 1566–67.

81. *See* Defendant's Exhs. 1750, 1750–1, 1751, 1751–1. Sales of both publications were substantially lower the second time they were distributed. *See* Plaintiff's Exh. G.

82. *See* Testimony of Michael Edrei, tr. at 109–10.

83. *See* Defendant's Exh. 1630; Testimony of Michael Liben, tr. at 1928; Testimony of Franklyn Rodgers, tr. at 1475.

84. *See* Testimony of Denise Bove, tr. at 1680–84; Testimony of David Miller, tr. at 2375–83; Testimony of David Moscow, tr. at 1853–54. In 1984, D.S. distributed approximately three times the number of copies of its teen magazines that it distributed in 1983. *See* Defendant's Exh. 1652; Plaintiff's Exh. G.

85. *See* Plaintiff's Exh. G; Testimony of David Miller, tr. at 2357–58.

86. ACB # 5, ACB # 15 and ACU # 4. *See* Defendant's Exhs. 196, 207, 286, 318, 409, 447, 1765.

87. *See* Plaintiff's Exh. G.

While the foregoing disposition makes it unnecessary to consider plaintiff's claims for damages, the Court notes that they would have required rejection. The estimated damages, totalling approximately $56,000,000,[88] are derived from unwarranted bases and speculative assumptions and are so conjectural that they could not serve as a proper basis for calculating plaintiff's alleged damages. The evidence makes abundantly clear that the most important factor in determining whether a publication is successful is its editorial content[89] and that the national distributor is only one participant in the newsstand sales market, yet plaintiff attributes *all* conceivable losses to Warner's actions. While it is recognized that a party who is entitled to a recovery of damages need not establish them with mathematical precision,[90] plaintiff's damages calculations are so grossly inflated and exaggerated as to render them meaningless.

## II. Warner's Counterclaims

As already noted, plaintiff terminated the contracts with Warner on March 7, 1985, which by their terms were not due to expire until June 30, 1985 and August 4, 1985. In its first counterclaim, Warner seeks damages for the commissions it lost as a result of plaintiff's premature termination of the contracts.

■ The basic principle of recovery for breach of contract is that the injured party should be placed in the same position it would have been in had the contract been performed.[91] It is axiomatic that contract damages are measured at the time of the breach.[92] Warner is entitled to recover $111,424, representing the 5% commission it would have earned for distributing D.S.'s magazines for the balance of the contracts' period.[93]

In its second counterclaim, Warner seeks to recover $1,018,716.43 for advances previously made by it to D.S. that had not been recouped as of March 7, 1985, when D.S. terminated the contracts.[94] D.S. contends that Warner is not entitled to recover the overdrafts because it accepted returns of unsold copies from wholesalers more than 120 days after the off-sale date and because Warner violated its affidavit policy by failing to verify the destruction of unsold copies by wholesalers under the policy.

---

**88.** Under three of its four damages theories, plaintiff's damages are estimated to exceed $50,000,000. One of its damages theories calculates that damages total $29,000,000.

**89.** See Testimony of A. Edward Miller, tr. at 2568–69; Testimony of David Moscow, tr. at 1843–44; Testimony of Frederick Klein, tr. at 1902–04; *see also* Testimony of Michael Edrei, tr. at 2770.

**90.** See *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 263–66, 66 S.Ct. 574, 579–81, 90 L.Ed.2d 652 (1946); *Contemporary Mission, Inc. v. Bonded Mailings, Inc.,* 671 F.2d 81, 84 (2d Cir.1982); *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926–27 (2d Cir.1977); *Compania Pelineon De Navegacion, S.A. v. Texas Petroleum Co.,* 540 F.2d 53, 56 (2d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Plant Planners, Inc. v. Pollock,* 60 N.Y.2d 779, 780–81, 469 N.Y.S.2d 675, 675, 457 N.E.2d 781, 782 (1983); *Barone v. Marcisak,* 96 A.D.2d 816, 465 N.Y.S.2d 561, 562 (2d Dep't 1983).

**91.** See, e.g., *Wallace Steel, Inc. v. Ingersoll-Rand Co.,* 739 F.2d 112, 115 (2d Cir.1984); *Adams v. Lindblad Travel,* 730 F.2d 89, 92 (2d Cir.1984); *Teachers Ins. & Annuity Ass'n of America v. Butler,* 626 F.Supp. 1229, 1236 (S.D.N.Y.1986); *Brown v. Lockwood,* 76 A.D.2d 721, 742–43, 432 N.Y.S.2d 186, 201 (2d Dep't 1980); *New York Water Serv. Corp. v. City of New York,* 4 A.D.2d 209, 213, 163 N.Y.S.2d 538, 542 (1st Dep't 1957).

**92.** See *J.M. Rodriguez & Co. v. Moore-McCormack Lines, Inc.,* 32 N.Y.2d 425, 429, 345 N.Y.S.2d 993, 995, 299 N.E.2d 243, 244 (1973); *Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 145, 320 N.Y.S.2d 225, 232, 269 N.E.2d 21, 26 (1971); *Orange & Rockland Utils., Inc. v. New England Petroleum Corp.,* 60 A.D.2d 233, 235, 400 N.Y.S.2d 79, 81 (1st Dep't 1977).

**93.** This figure is derived from the actual sales of those magazines. See Defendant's Exhs. 1672, 1726; Testimony of Sheldon Korn, tr. at 1790–93.

**94.** See Defendant's Exhs. 1625, 1625–1, 1756, 1756–1; Testimony of Sheldon Korn, tr. at 1799–1805; Testimony of Lawrence Zinger, tr. at 1815–20.

■ The parties' contracts make clear that Warner was free to accept returns from wholesalers if they were shipped by the wholesalers to Warner within 120 days of the off-sale date; they need not have been received within that time.[95] There is no evidential support in the record for plaintiff's claim that Warner violated the contracts by accepting returns shipped after the 120–day period. Edrei's conclusory statements and his testimony based on charts he did not prepare and for which no supporting documentation or testimony were offered, are not substitutes for evidence.[96]

■ However, Warner acknowledged that $48,849 of returns had been received up to four weeks after the 120–day period.[97] Because Warner failed to offer any support for its assumption that returns shipped within 120 days of the off-sale date are not received by it until as many as four weeks later, this amount is disallowed. In addition, the Court does not award the $23,400 of returns Warner was unable to account for.[98]

■ D.S.'s claim that Warner is not entitled to the overdrafts because it failed to verify that unsold copies had been destroyed by wholesalers participating in its Affidavit Return Privileges program is also without merit. The contracts between Warner and D.S. provided that wholesalers returning unsold copies could do so by returning front covers, headings or affidavits, which "shall constitute sufficient evidence of such unsold copies."[99] Accepting the affidavits complied with the parties' understanding.[100] If D.S. was dissatisfied with Warner's policies or its administration of the Affidavits Return Privileges program, it was entitled to request returns of the actual copies of the magazines rather than affidavits[101] and to audit Warner's books and records.[102] D.S. failed to avail itself of either of these options. Accordingly, defendant is entitled to $946,467.43 on its second counterclaim.

In its third counterclaim, Warner claims that it was fraudulently induced to advance $79,384 to D.S. in February 1985 by Edrei's misrepresentations that D.S. in good faith was considering renewing the contracts. To prove fraud, a party must show by clear and convincing evidence[103] that the other party made one or more representations of a material fact; that the representations were false when made; that the party making the representations acted knowingly or intentionally; that the representations were relied on; and that damages were incurred as a direct or reasonably foreseeable result of the misrepresentations.[104]

95. The contracts provided: "In determining the sums payable to Publisher, Warner shall be entitled to deduct returns of each issue of the Publication(s) *shipped* to Warner from wholesalers ... at any time within 120 days of the off-sale date of each such issue of the Publication(s)...." Plaintiff's Exhs. B and C, para. 8 (emphasis added).

96. *See* Testimony of Michael Edrei, tr. at 1159–60, 1316–20.

97. *See* Testimony of Sheldon Korn, tr. at 1802.

98. *Id.* at 1804.

99. Plaintiff's Exhs. B and C, para. 8.

100. Neither the contracts between D.S. and Warner nor the Affidavit Privileges agreements, upon which D.S. relies, required Warner to audit returns claims or to investigate withholding prior to crediting wholesalers for returns.

101. *Id.*

102. *Id.* at para. 16.

103. *See, e.g., Computerized Radiological Servs. v. Syntex Corp.,* 786 F.2d 72, 76 (2d Cir.1986); *Weinberger v. Kendrick,* 698 F.2d 61, 78 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *Ajax Hardware Mafg. Corp. v. Industrial Plants Corp.,* 569 F.2d 181, 186 (2d Cir.1977); *McDonnell v. American Leduc Petroleums, Ltd.,* 456 F.2d 1170, 1176 (2d Cir.1972); *Revlon, Inc. v. Carson Prods. Co.,* 602 F.Supp. 1071, 1100 (S.D.N.Y.1985); *Jaksich v. Thomson McKinnon Secs., Inc.,* 582 F.Supp. 485, 502 (S.D.N.Y.1984).

104. *See, e.g., Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Revlon, Inc. v. Carson Products Co.,* 602 F.Supp. 1071, 1100 (S.D.N.Y.1985); *Ainger v. Michigan General Corp.,* 476 F.Supp. 1209, 1227 (S.D.N.Y. 1979), *aff'd,* 632 F.2d 1025 (2d Cir.1980); *see also Deyo v. Hudson,* 225 N.Y. 602, 612, 122 N.E. 635 (1919); *Adams v. Gillig,* 199 N.Y. 314, 317–23, 92 N.E. 670 (1910).

In January and February 1985, Edrei, on behalf of D.S., began discussing renewal of the contracts with Rodgers and John Manuli of Warner. At the same time, Edrei met with representatives of competing distributors, Select and Curtis Publishing Company, to discuss their proposals. Edrei acknowledged that by January 1985, he had lost confidence in Warner and that Smith and Gudaitis were recommending that he find another national distributor.[105] Despite this, Edrei met with Rodgers and Manuli and carried on negotiations, during which various proposals and counter-proposals were advanced. During the negotiations, Rodgers "repeatedly said that [Warner] really had to know what [D.S.] was going to do because [Warner] had to make a schedule of deductions to recover the monies owed" by D.S.[106]

Defendant contends that although Edrei knew D.S. would not renew the contracts, he falsely represented that D.S. had not yet decided whether to renew the contracts with Warner and that D.S. was waiting for the results of the distribution assignment being conducted by Warner at that time.[107] At the end of February, Rodgers authorized Warner to pay $79,000 of the $120,000 advance due to D.S. Warner claims it relied on Edrei's representations in making the advance, which Warner contends it was not obligated to pay in light of the overdraft situation that existed.

 The Court finds that Warner has failed to sustain its burden of proving fraud by clear and convincing evidence. The evidence shows that while Warner may not have been contractually obligated to make the February 1985 advance to D.S.,[108] D.S. did not make misrepresentations to Warner that induced the advance. The parties were engaged in give-and-take bargaining discussions and advanced various proposals for new contracts. Warner did not establish that any statements Edrei made were false or that they were intentionally made to mislead Warner into paying the February advance. Accordingly, Warner's fraud claim is dismissed.[109]

The foregoing shall constitute the Court's findings of fact and conclusions of law. Judgment may be entered accordingly.

So ordered.

---

**105.** Tr. at 148.

**106.** Tr. at 1424.

**107.** Testimony of Michael Edrei, tr. at 160; Testimony of Franklyn Rodgers, tr. at 1425.

**108.** The contracts provided that Warner was entitled to deduct the overdrafts from any advance. *See* Plaintiff's Exhs. B and C, para. 11.

**109.** As noted previously, D.S. offered no evidence to sustain its fraud claim and, accordingly, it is dismissed.