CONAN PROPERTIES, INC., Plaintiff,

v.

MATTEL, INC., Defendant.

MATTEL, INC., Counterclaim Plaintiff,

v.

CONAN PROPERTIES, INC., Merchandise Development Corp., Conan Merchandising Corp., University Patents, Inc., Conan Licensing Co., and Summit Licensing Co., Counterclaim Defendants.

No. 84 Civ. 5799 (RPP).

United States District Court, S.D. New York.

April 19, 1989.

See also 619 F.Supp. 1167.

Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City by James Rhodes, Jr. (Stephen B. Judlowe and Michael F. Hurley, on the briefs), for plaintiff and counterclaim defendants.

Welsh & Katz, Chicago, Ill. by Eric C. Cohen (A. Sidney Katz and Suzanne Hines, on the briefs), and Fulbright Jaworski & Reavis McGrath, New York City by Ralph C. Dawson, for defendant and counterclaim plaintiff.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This lawsuit pits Conan of Cimmeria, the Barbarian, against He–Man of Eternia, a Master of the Universe, two warriors who have been fighting for five years on anomalous terrain: the courtroom, instead of the battlefield. In 1984, Conan Properties, Inc. sued Mattel, Inc., alleging copyright infringement, trademark infringement, unfair competition, dilution, breach of contract, and fraud.[1] Mattel then counterclaimed against Conan Properties, Inc., its affiliates, and their subsidiaries[2] (collec-

---

1. Jurisdiction over the federal copyright and trademark claims rests on 28 U.S.C. § 1338(a); jurisdiction over the state unfair competition claim rests on *id.* § 1338(b). The Court has pendent jurisdiction over the state law dilution, breach of contract, and fraud claims. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

2. According to Mattel's counterclaim complaint, Conan Licensing Co., with which Mattel entered into the license at issue, is a partnership between Conan Properties, Inc. and Merchandise Development Corp., a subsidiary of University Patents, Inc.; Summit Licensing Co. is a partnership between Merchandise Development Corp. and Sigma Merchandising Corp., a non-

tively, "CPI") for fraud.[3] Mattel has now moved for summary judgment on all the claims raised by CPI, and CPI has moved for summary judgment on the count raised by Mattel. *See* Fed.R.Civ.P. 56. For the reasons following, the Court grants Mattel summary judgment on CPI's copyright, trademark, unfair competition, and dilution claims, and denies Mattel summary judgment on CPI's breach of contract and fraud claims. The Court denies CPI summary judgment on Mattel's fraud claim. This opinion begins by discussing summary judgment in general, and goes on to consider each issue in turn.

### I. Summary Judgment

In 1986, the United States Supreme Court reminded the federal district courts that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Soon thereafter, however, the Second Circuit counseled prudence. Summary judgment, the Second Circuit stressed, should not be "granted improvidently." *Donahue v. Windsor Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987); *see also Ramseur v. Chase Manhattan Bank*, 865 F.2d 460 (2d Cir.1989); *Arthur Glick Truck Sales, Inc. v. General Motors Corp.*, 865 F.2d 494 (2d Cir.1989). Mindful of the cautious course a district judge must chart, this Court begins by reviewing the governing principles of law. *See Ramseur, supra,* 865 F.2d at 464–65.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, if any, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

.    .    .    .    .

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial....

Fed.R.Civ.P. 56(c), 56(e). The Second Circuit has emphasized that summary judgment is meant to clear the air before trial and thereby enable a district judge to see whether any fire of substance flickers beneath the parties' smoke. *See Donahue, supra,* 834 F.2d at 57. In general, then, when properly applied, "summary judgment allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial." *Id.* at 58.

More specifically, a party moving for summary judgment need not offer affirmative evidence that negates her adversary's proof, so long as the nonmovant bears the ultimate burden of persuasion at trial; instead, the movant properly supports her motion for summary judgment when she " 'show[s]'—that is, ... point[s] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett, supra,* 477 U.S. at 325, 106 S.Ct. at 2554. By the time of the motion the nonmovant has ordinarily finished gathering the evidence upon which she plans to rely at trial or has had more than adequate opportunity to do so.[4] For the case to proceed to trial there must

party; and Conan Merchandising Corp. is a subsidiary of Conan Properties, Inc.

**3.** The parties have abandoned their respective civil RICO counts.

**4.** Under Fed.R.Civ.P. 56(f) the district judge "may refuse the application for judgment or may order a continuance to permit affidavits to

be obtained or depositions to be had or may make such other order as is just," but only when the non-movant's opposing affidavits reveal that "for reasons stated" the non-movant is unable "to present by affidavit facts essential to justify the party's opposition." *See Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511–12 (2d Cir.1989).

be a *genuine* issue of *material* fact on each element of the nonmovant's claim. A fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court must "resolve all ambiguities and draw all reasonable inferences against the moving party." *Donahue, supra,* 834 F.2d at 57. Furthermore, because the standard for entry of summary judgment "mirrors the standard for a directed verdict" under Fed. R.Civ.P. 50(a), *Liberty Lobby, supra,* 477 U.S. at 250, 106 S.Ct. at 2511, a district court considering a summary judgment motion must apply the substantive measure of proof that would be implicated at trial. *See id.* at 252–56, 106 S.Ct. at 2512–14. In short, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2510; *see also Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988).

## II. Copyright Infringement

This story really begins in the early 1930s, when a visionary named Robert E. Howard transcribed the exploits of Conan of Cimmeria. Warrior scion of a "barbarian blacksmith," Conan lives in the "Hyborian Age, between the sinking of Atlantis and the beginnings of recorded history." Deposition of L. Sprague de Camp at 17 (Dec. 3, 1985). In the words of a contemporaneous work, "The Nemedian Chronicles":

Know, O prince, that between the years when the oceans drank Atlantis and the gleaming cities, and the years of the rise of the sons of Aryas, there was an Age undreamed of, when shining kingdoms lay spread across the world like blue mantles beneath the stars.... Hither came Conan, the Cimmerian, black-haired, sullen-eyed, sword in hand, a thief, a reaver, a slayer, with gigantic melancholies and gigantic mirth, to tread the jeweled thrones of the Earth under his sandaled feet.

"The Nemedian Chronicles," *reprinted in* P.S. Miller & J. Clark, *A Probable Outline of Conan's Career* (1938).[5]

In "Red Nails," which first appeared in *Weird Tales* magazine in 1936, Howard described Conan's imposing physique:

He was almost a giant in stature, muscles rippling smoothly under his skin, which the sun had burned brown.

.    .    .    .    .

His great shoulders were as broad as those of Olmec and more cleanly outlined, and his huge breast arched with a more impressive sweep into a hard waist.... He might have been an image of primal strength cut out of bronze.... Conan was a figure out of the dawn of time....

R. Howard, "Red Nails," *reprinted in Conan the Warrior* 15, 95 (L.S. de Camp ed. 1967). Conan's job is quite interesting, at least by today's standards: a "mercenary swordsman, ... hetman of the kozaki who dwell along the Zaporoska River," Conan travels all over the world seeking (and finding) treasure, and grappling with monsters, magicians, and scantily-clothed women. Nor would gray flannel be appropriate for someone in Conan's profession. Conan wears a "pantherskin loin-clout" and a "hauberk [of] leather and mail mesh." A "broad leather belt" encircles Conan's hard waist, and Conan never leaves home without his "broadsword and poniard." R. Howard, "The Hour of the Dragon," *reprinted in Conan the Conqueror* 24, 121 (L.S. de Camp ed. 1967); "Red Nails," *supra,* at 15.

Robert Howard ultimately wrote twenty plus Conan stories before he committed suicide in 1936.[6] All were originally pub-

---

**5.** For more information on Conan and his creator, see generally G. Lord, *The Last Celt: A Bio-bibliography of R.E. Howard* (1978).

**6.** The completed stories are "Beyond the Black River," "Black Colossus," "The Devil in Iron," "Jewels of Gwahlur," "The People of the Black Circle," "The Phoenix on the Sword," "The Pool of the Black One," "Queen of the Black Coast," "Rogues in the House," "Red Nails," "The Scarlet Citadel," "Shadows in Zamboula," "Shadows

lished in *Weird Tales,* and all came under the blanket copyrights secured for each issue of the magazine in the name of the Popular Fiction Publishing Co. When the copyrights lapsed after twenty-eight years, however, only seven of the seventeen were renewed. Declaration of E. Fulton Brylawski (Sept. 11, 1987). As a result, the Conan of Robert Howard resides in the public domain.

CPI, the ultimate beneficiary of Howard's genius, owns copyrights in eight Conan comic books published by Marvel Comics in the late 1970s.[7] In the first count of its complaint, CPI alleges that Mattel's He–Man doll infringes its rights in Conan. Third amended complaint ¶¶ 22–27. A plaintiff alleging copyright infringement must prove that she owns a valid copyright and that the defendant copied the protected work without authorization. *E.g., Eckes v. Card Prices Update,* 736 F.2d 859, 861 (2d Cir.1984) (citing *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 (2d Cir.1977)); *Manufacturers Technologies, Inc. v. Cams, Inc.,* 706 F.Supp. 984 (D.Conn.1989). Yet the law does not proscribe the copying of material that cannot be copyrighted. The Court thus begins by assessing the validity of CPI's registrations.[8]

One of the first rudiments of intellectual property is that no one may copyright an idea. The benefits of the Copyright Act of 1976, Pub.L. No. 94–553, 90 Stat. 2541 (codified as amended at 17 U.S. C. §§ 101–810 (1982 & Supp. IV 1986)), extend only to "works of authorship fixed in [a] tangible medium of expression." 17 U.S.C. § 102(a); *see id.* § 102(b); *see also Mazer v. Stein,* 347 U.S. 201, 217–18, 74 S.Ct. 460, 470–71, 98 L.Ed. 630 (1954); *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1880). Here, that principle means that CPI may not arrogate any legal rights in the "unprotectable [sic] idea [of] a superhuman muscleman." *Mattel, Inc. v. Azrak–Hamway Int'l, Inc.,* 724 F.2d 357, 360 (2d Cir.1983) (per curiam); *cf. Nichols v. Universal Pictures Corp.,* 45 F.2d 119 (2d Cir. 1930) ("A comedy based upon conflicts between Irish and Jews, into which the marriage of their children enters, is no more susceptible of copyright than the outline of Romeo and Juliet.") (L. Hand, J.), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).

Another basic precept holds that authors can only copyright expressions that are "original." 17 U.S.C. § 102(a); *see* U.S. Const. art. I, § 8, cl. 8. In crafting their own work, of course, authors often borrow from the opera of others. The results may still be copyrighted. 17 U.S.C. § 103(a) ("The subject matter of copyright ... includes compilations and derivative works"). In a previous decision in this case, Judge Duffy wrote that CPI's Conan "unquestionably deriv[es]" from Howard's

---

in the Moonlight," "The Slithering Shadow," "The Tower of the Elephant," "The Hour of the Dragon," "The God in the Bowl," "The Frost Giant's Daughter," "The Vale of Lost Women," and "A Witch Shall Be Born." Before he died Howard wrote parts of other stories, most of which were finished by L. Sprague de Camp.

**7.** The registered comic books are: *The Savage Sword of Conan the Barbarian* no. 38, "Valley of the Vampires" (Registration No. TX 212–755); no. 39, "Legions of the Dead" (Registration No. TX 212–753); no. 40, "A Dream of Blood" (Registration No. TX 268–713); no. 41, "Slave of the Amazon Queen" (Registration No. TX 268–712); and no. 42, "The Devil Trees of Gamburu" (Registration No. TX 268–711); and *Conan the Barbarian* no. 99, "Man-crabs of the Dark Cliffs" (Registration No. TX 245–177); no. 100, "Death on the Black Coast" (Registration No. TX 245–251); and no. 101, "The Devil Has Many Legs"

(Registration No. TX 245–232). In *Conan Properties, Inc. v. Mattel, Inc.,* 601 F.Supp. 1179 (S.D. N.Y.1984), Judge Duffy gave CPI leave to plead any copyrights in any Conan books, comics, or movies other than the eight works listed above. CPI declined to do so, and its infringement action is accordingly limited.

**8.** The Copyright Act provides that "the certificate of a registration ... shall constitute prima facie evidence of the validity of the copyright...." 17 U.S.C. § 410(c). CPI does hold eight certificates. A "certificate of registration creates no irrebuttable presumption of copyright validity [however, and when] other evidence casts doubt on the question, validity will not be assumed." *Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 908 (2d Cir.1980). The burden of proving invalidity rests on Mattel. *Gaste v. Kaiserman,* 863 F.2d 1061, 1064 (2d Cir.1988).

Conan within the meaning of the Copyright Act. *Conan Properties, Inc. v. Mattel, Inc.*, 601 F.Supp. 1179, 1182 (S.D.N.Y.1984) ("*Conan I*"); *see* 17 U.S.C. § 101 ("A 'derivative work' is a work based upon one or more preexisting works."). CPI has never challenged this conclusion, and it is difficult indeed to imagine how it could. Yet even a derivative work must be "original" to warrant copyright protection, and although originality "need not be invention in the sense of striking uniqueness, ingeniousness or novelty," *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir.), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed. 2d 135 (1976), a derivative work must "contain[ ] some substantial, not merely trivial, originality," *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir.1980) (quoting *Chamberlin v. Uris Sales Corp.*, 150 F.2d 512, 513 (2d Cir.1945)); *see Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 104–05 (2d Cir.1951) (Frank, J.). Furthermore, "scenes a faire," or "incidents, characters, or settings which, as a practical matter, are indispensable or standard in the treatment of a given topic," are not protected either. *Walker v. Time Life Films, Inc.*, 615 F.Supp. 430, 436 (S.D.N.Y.1985), *aff'd*, 784 F.2d 44 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *see also Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.1976). Therefore, to warrant the protection of the Copyright Act, a derivative work must contain "non-trivial" original aspects distinct from both the underlying work in the public domain, and from the scenes a faire that inhere in its genre.

■ Just what, if anything, original CPI has contributed is difficult to discern. To begin with, Conan fits comfortably within the identifiable genus of superhero musclemen, and most, if not all, of that fraternity look related. *Cf., e.g., Walker v. Time Life, supra*, 784 F.2d at 50. The Court has read comics starring characters named "Atlas"; "Beowulf, Dragon Slayer"; "Hercu-

les"; "John Carter, Warlord of Mars"; "Tarzan, Lord of the Jungle"; and "Tor, the Caveman." All of the protagonists are square-jawed and broad-shouldered. All are inordinately strong, and all wear scraps of cloth that reveal every distended muscle. In the vernacular, they are all "hunks." At oral argument, counsel for CPI insisted that its Conan possesses a uniquely styled musculature, which differs significantly both from the other superhero hunks of the fantasy comic world, and from the lithe, swimmer-like Conan depicted in the illustrations that accompanied Howard's books. *See* Transcript of oral argument at 15–21 (Feb. 16, 1989); *see also* Deposition of A. Sidney Alpert at 571 (Feb. 14, 1985). The question is close. In deciding it the Court looks to the Second Circuit's decision in *Mattel, Inc. v. Azrak–Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir.1983) (per curiam), where the panel held that the "accentuat[ion] [of] certain muscle groups relative to others" "constitute[s] the protectable [sic] expression of an idea"—in that case, the idea embodied in Mattel's He–Man doll. By analogy, this Court finds CPI's contribution non-trivial, and nonstandard, enough to withstand an attack on the validity of CPI's copyrights in the eight Conan comic books. *See id.; cf. Gracen v. Bradford Exch.*, 698 F.2d 300 (7th Cir.1983) (painting of Dorothy derived from Wizard of Oz photograph not original enough for protection despite "perceptible differences"); *Past Pluto Prods. Corp. v. Dana*, 627 F.Supp. 1435 (S.D.N.Y.1986) (not enough originality in foam crowns derived from Statue of Liberty).

■ According to the express terms of the Copyright Act, however, CPI's Conan, as depicted in the eight Marvel comic books, is only protected from infringement to the extent of CPI's original contribution. *See, e.g., Stodart v. Mutual Film Corp.*, 249 F. 507, 510 (S.D.N.Y.1917) (L. Hand, J.), *aff'd mem.*, 249 F. 513 (2d Cir.1918) (per curiam).[9] The precise scope of CPI's

---

9. The Copyright Act explicitly provides that [t]he copyright in a ... derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not

copyrights would normally be an issue of fact for trial.[10]  *Conan I, supra*, 601 F.Supp. at 1182.  Yet no jury need consider this issue, because whatever the exact scope of CPI's rights, CPI fails to raise a question of fact concerning their infringement. ·

In its complaint, CPI alleges generally that Mattel's He–Man doll infringes its copyrights in Conan.  *See* 17 U.S.C. § 106 (listing "Exclusive rights in copyrighted works").  More specifically, CPI contends, He–Man is simply "Conan disguised with a blond wig."  CPI's memorandum in opposition to defendant's motion for summary judgment at 37.  CPI offers no direct evidence of copying; instead, CPI attempts to prove infringement circumstantially.  To do so, CPI must show, first, that Mattel had access to Conan, and second, that Conan and He–Man are "substantially similar."  *Walker v. Time Life, supra*, 784 F.2d at 48; *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 (2d Cir. 1982).  Mattel categorically denies that it ever had access to the Conan comic books, and CPI offers no proof of access in response.  This complete lack of evidence on an element of CPI's case would ordinarily warrant the entry of summary judgment against it.  Access may be inferred, however, "if the plaintiff's work has been widely disseminated, as by extensive publication."  3 M. Nimmer & D. Nimmer, *The Law of Copyright* § 13.02[A] (1987) [hereinafter *Nimmer*];  *see Detective Comics, Inc. v. Bruns Publications, Inc.*, 28 F.Supp. 399, 400 (S.D.N.Y.1939), *modified*, 111 F.2d 432 (2d Cir.1940);  *see also Stratchborneo v. Arc Music Corp.*, 357 F.Supp. 1393, 1403 (S.D.N.Y.1973) (Brieant,

J.).  The inference of access is easily drawn from evidence of the sales figures of the Conan comics.  Yet "even clear and convincing evidence of access will not avoid the necessity of also proving substantial similarity since access without similarity cannot create the inference of copying."  *Nimmer, supra*, § 13.03[D].  Even if the copyrights at issue are given as broad a scope as CPI wants, CPI cannot demonstrate that the comparable aspects of He–Man are substantially similar to the protected elements of Conan.

■  The Second Circuit test for substantial similarity is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."  *Steinberg v. Columbia Pictures Indus. Inc.*, 663 F.Supp. 706, 711 (S.D.N.Y.1987) (quoting *Ideal Toy Corp. v. Fab–Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966)).  In the words of Judge Learned Hand, two works are substantially similar when "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same."  *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960).[11]  Although the question of substantial similarity is usually one of fact, it may, if warranted, be decided as a matter of law.  *E.g., Walker v. Time Life, supra*, 784 F.2d at 48 (district court may grant summary judgment "when the similarity concerns only noncopyrightable elements of plaintiff's work, or when no reasonable trier of fact could find the works substantially similar");  *Warner Bros., Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir.1983).[12]

affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.
17 U.S.C. § 103(b);  *see, e.g., Silverman v. CBS Inc.*, 870 F.2d 40, 49 (2d Cir.1989) ("a copyright affords protection only for original works of authorship and, consequently, copyrights in derivative works secure protection only for the incremental additions of originality contributed by the authors of the derivative works").

**10.**  CPI does not claim any protection in Conan's personality, which does not seem, at least to this Court, to have evolved any since the 1930s. CPI's rights can therefore only cover Conan's

appearance.  The Court notes in passing that He–Man and Conan hold different world views.

**11.**  CPI suggests that the content of the Second Circuit test for substantial similarity should depend on the relationship of the copyright owner and the alleged infringer, but it offers no legal authority to support this proposition.  Nor does CPI explain why this Court should deviate from the accepted test.  As a result, the Court declines to do so.

**12.**  This Circuit retreated long ago from any intimation to the contrary in *Arnstein v. Porter*, 154

Again, this Court is guided by the Second Circuit's decision in *Azrak–Hamway.* In that case Mattel had sought a preliminary injunction against a rival toymaker that, Mattel charged, infringed Mattel's rights in its line of Masters of the Universe toys (which includes He–Man). The district court held that Mattel had not demonstrated " 'either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation.' " 724 F.2d at 359 (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)). The Second Circuit then affirmed. According to the panel, "the district court reasonably found that the only parts of the dolls' bodies that constitute the protectable [sic] expression of an idea"— the particular form of muscle development —"were not substantially similar." *Id.* at 360 (citing *Ideal Toy Corp. v. Sayco Doll Corp.,* 302 F.2d 623, 627 (2d Cir.1962) (Clark, J., dissenting)). This Court has read the Conan comic books and examined the He–Man doll. The protected elements of Conan and He–Man are not substantially similar,[13] and no reasonable trier of fact could conclude otherwise.[14] *See, e.g., Walker v. Time Life, supra,* 784 F.2d at 48–50; *Hearn v. Meyer,* 664 F.Supp. 832

F.2d 464, 473 (2d Cir.1946). *See Smith v. Weinstein,* 578 F.Supp. 1297, 1302 (S.D.N.Y.1984) ("courts in copyright actions are permitted 'to put "a swift end to meritless litigation" and to avoid lengthy and costly trials' ") (quoting *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980)).

13. *Cf.* Deposition of Mimi Shapiro at 215 (Feb. 28, 1985).

14. While strong, Conan is probably no better muscled than body-builder Arnold Schwarzenegger, who played Conan in the film "Conan the Barbarian." Indeed, the president of CPI explicitly confirmed that comparison. *See* Affidavit of Sanford D. Bronsther ¶ 4(m) (May 19, 1988) ("Schwarzenegger's extraordinarily muscled body fit exactly the current CONAN image of ['fantasy barbarian artist' Frank] Frazetta and Marvel [Comics]"). In 1977, shortly after he won the Mr. Olympia title, Schwarzenegger's chest measured fifty-seven inches, and his calves measured twenty inches. A. Schwarzenegger & D. Hall, *Arnold: Education of a Bodybuilder Passim* (1977). A six foot two inch He–Man, in contrast, would have calves measuring

(S.D.N.Y.1987); *Green v. Proctor & Gamble, Inc.,* 709 F.Supp. 418 (S.D.N.Y.1989); *cf. Burroughs v. Metro–Goldwyn–Mayer, Inc.,* 683 F.2d 610 (2d Cir.1982).

## III.  Trademark Infringement

 In its complaint CPI alleges that Mattel has sold toys "having appearance and design features which are confusingly similar to the design and appearance of Conan," and that that "constitutes false designation of origin" in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982).[15] Third amended complaint ¶¶ 31, 32. As the Second Circuit has written, section 43(a)'s "purpose is to prevent consumer confusion regarding a product's source, and to enable those that fashion a product to differentiate it from others on the market." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1220 (2d Cir.1987). To succeed in its Lanham Act claim CPI must show that the Conan character functions as a trademark—that it has "secondary meaning" which identifies its source; and that the similarities shared by Conan and He–Man are likely to confuse consumers about that source. *Id.* at 1221.

twenty-nine inches—thirty one percent larger than Schwarzenegger's—and a chest measuring seventy-one inches—twenty percent larger than Schwarzenegger's. Sworn declaration of Susan K.B. Urbas (Sept. 16, 1987). *Cf. Ideal Toy Corp. v. Fab–Lu Ltd.,* 360 F.2d 1021, 1023 (2d Cir. 1966) ("distinct differences exist with respect to the neck structures and hair styles, and to a lesser extent with respect to the over-all craftsmanship").

15. Section 43(a) provides:
Any person who shall affix, apply, or annex, or use in connection with any goods ..., a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods ... to enter into commerce, ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or likely to be damaged by the use of any such false description or representation.
15 U.S.C. § 1125(a) (1982).

■ Although CPI offers no actual evidence of secondary meaning, in the license agreement it signed with Conan Licensing Co. Mattel explicitly "recognize[d] the great value of the goodwill associated with CONAN, and acknowledge[d] that ... the name and trademark CONAN has a substantial secondary meaning in the mind of the public." Conan Licensing Agreement ¶ 4, at 9 (July 31, 1981) [hereinafter *License*]; *see also id.* at 1 (Conan "is well known and recognized by the general public and is associated in the public mind with [CPI]"). Mattel's concession is not enough, for " 'proof of secondary meaning entails ... [r]igorous evidentiary requirements.' " *Motown Prods., Inc. v. Cacomm, Inc.*, 668 F.Supp. 285, 289 (S.D.N.Y.1987), *rev'd on other grounds*, 849 F.2d 781 (2d Cir.1988). *See generally Centaur Communications*, 830 F.2d at 1221–25.[16] Even assuming that Conan the Barbarian does have secondary meaning, however, CPI has failed to show consumer confusion. *See, e.g., Universal City Studios, Inc. v Nintendo Co.*, 746 F.2d 112, 115–20 (2d Cir.1984).

Lanham Act claims are often appended to copyright actions, and often, as here, the legal considerations in copyright apply to trademark law. Thus, "the absence of substantial similarity [for the purposes of a copyright action] leaves little basis for asserting a likelihood of confusion or palming off for purposes of a claim under § 43(a) of the Lanham Act." *Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 246 (2d Cir.1983) (quoting *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 918 (2d Cir.1980)); *cf. Centaur Communications, supra*, 830 F.2d at 1225 (discussing "multifactor balancing test" set out in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961)). CPI does put forth proof showing that "on occasion" children visiting local toy stores mistook an actor clothed like He–Man for Conan. Affidavit of Daniel J. Sapinkopf (Mar. 30, 1988). Yet there is no showing that the doll itself was the subject of confusion, and no human being—not even Arnold Schwarzenegger—could really do He–Man justice. The case law makes clear, moreover, that even that quantum of evidence of actual confusion is not weighty enough to withstand a motion for summary judgment. *E.g., Warner Bros., supra*, 720 F.2d at 246 (although "some" television viewers might confuse bumbling "Greatest American Hero" with Superman, not enough evidence of likelihood of confusion to raise factual question for jury); *cf. Mattel, Inc. v. Azrak–Hamway Int'l, Inc.*, 724 F.2d 357, 361 (2d Cir.1983) (per curiam) ("what has become a usual way to demonstrate ... consumer confusion ..., in a case where the existence of ... consumer confusion is not otherwise obvious, is for the proponent to undertake some form of survey of consumer attitudes under actual market conditions"); *Essence Communications, Inc. v. Singh Indus., Inc.*, 703 F.Supp. 261, 269 (S.D.N.Y.1988).

■ CPI's complaint also alleges unfair competition under New York common law and dilution in violation of the New York anti-dilution statute, N.Y. Gen. Bus. Law § 368–d (McKinney 1989).[17] To the extent that CPI's New York cause of action for unfair competition is not preempted by the Copyright Act,[18] CPI must still show a

---

**16.** According to the court in *Motown Prods.*, "the most important indicia of secondary meaning are advertising expenditures, consumer studies linking the name to a source, sales success, unsolicited media coverage of the product, attempts to plagiarize the mark, and length and exclusivity of the mark's use." 668 F.Supp. at 289; *see Centaur Communications, supra*, 830 F.2d at 1221 ("focus of secondary meaning ... is the consuming public").

**17.** "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of ... unfair competi-

tion, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y.Gen.Bus.Law § 368–d (McKinney 1989).

**18.** The Copyright Act preempts "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified" in the statute itself. 17 U.S.C. § 301(a). The Second Circuit has interpreted this to mean that the Act preempts "state law claims that rely on the misappropriation branch of unfair competition ... [but not] state unfair competition [claims that] allege a tort of 'passing off.' " *Warner Bros., Inc. v. American*

likelihood of confusion. CPI's claim should therefore fail for the reasons discussed above. The New York statute does not require likelihood of confusion, but it does require that a plaintiff's distinctive mark be "diluted"—that is, "blurred" or "tarnished." As Mattel points out, however, CPI offers no evidence at all that Mattel's He–Man has blurred or tarnished CPI's Conan trademark. *See, e.g., Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.,* 678 F.Supp. 424, 429 (S.D.N.Y.1987); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate here as well.

### *IV. Breach of Contract*

Forty years after Robert Howard's death, Conan had become more popular than ever. Marvel Comics was selling over one million Conan comic books annually, and Dino de Laurentiis had agreed to distribute a Conan film with script by Oliver Stone and Conan by Arnold Schwarzenegger. Affidavit of Sanford D. Bronsther ¶¶ 4(f), 4(j), 4(*l*), 4(m) (May 19, 1988). Mattel, well aware of Conan's popularity, commissioned Anthony Guerrero early in 1981 to sculpt a barbarian fantasy character to serve as a He–Man prototype. Declaration of Anthony G. Guerrero (Aug. 26, 1983). At around the same time, Mattel began considering more seriously the prospect of obtaining a license for Conan. Negotiations ensued. On May 5, 1981, A. Sidney Alpert, president of Conan Licensing, sent Jack Fox, director of licensing at Mattel, a draft of a licensing agreement. In his cover letter, Alpert wrote that "I understand that your attorneys will have to review the contract. (Indeed, I look forward to matching wits with them.)" Letter from A. Sidney Alpert to Jack Fox (May 5, 1981).

CPI and Mattel consummated their deal on July 31. In the meantime, Mattel's employees had continued work on a Conan doll. Mattel's marketing department decided early in June that Mattel should attach the Conan heads to the torsos of Mattel's "Big Jim," a doll with less exaggerated muscles, and a body closer to that of the average weightlifter (though not, apparently, to that of Arnold Schwarzenegger, *see* Affidavit of Mimi Shapiro ¶¶ 7–9 (May 19, 1988)). Memorandum from Joe Morrison to Mark Ellis (June 3, 1981). Guerrero then worked on the Conan doll from July 23, 1981, to September 21.

The CPI–Mattel marriage was rocky from the start. Mattel executives previewed the Conan film on September 17, and in a memorandum written shortly thereafter, Fox expressed concern over the "heavy problems" and "backlash of criticism" he foresaw from the "Sex and Violence ..., decapitation, slashing from groin to throat." Memorandum from Jack Fox to Joe Morrison, Tom Kalinske, and Pat Feely (Sept. 21, 1981). On October 30, Mattel's Joe Morrison told Alpert and Mimi Shapiro, vice-president of Conan Licensing, that Mattel would only put out a Conan toy if the film were toned down. *See* Deposition of Mimi Shapiro at 179–85 (Feb. 28, 1985) [hereinafter Shapiro deposition]; *cf.* Deposition of A. Sidney Alpert at 456, 465, 468 (Feb. 14, 1985) [hereinafter Alpert deposition]. The film's producers made changes, but Mattel was not satisfied. On December 22 Fox spoke to Alpert by telephone and told him that Mattel would not market any Conan "plastic action toy figures" or "related vehicles [or] implements of war." *See* Defendant's exhibit DS, appendix 55 to Mattel's memorandum in support of its motion for summary judgment (notebook of A. Sidney Alpert).

Alpert and Shapiro saw a He–Man doll at the Toy Fair in February 1982, and they told Arthur Lieberman, CPI's general counsel, that they thought Mattel had modeled He–Man on Conan. Shapiro deposition, *supra,* at 213–15. On March 22, 1982 Alpert called Fox to convey his displeasure over the course of events. On April 14, 1982 CPI and Mattel signed an agreement terminating the July 31, 1981 license.

*Broadcasting Cos.,* 720 F.2d 231, 247 (2d Cir. 1983). Here, CPI's complaint suggests that it charges Mattel with misappropriation.

As its lawyer conceded at oral argument, its claim for breach of contract is the nub of CPI's lawsuit. Transcript of oral argument at 8–9, 13, 38 (Feb. 16, 1989). CPI's complaint charges Mattel with breaching both the license agreement and the contract that terminated it. First, CPI argues that Mattel breached the clause of the license that obligated it to market toys "of high standard and of such style, appearance, and quality as to be adequate and suited to their exploitation to the best advantage and to the protection and enhancement of the name CONAN and the goodwill pertaining thereto." *License, supra,* ¶ 7, at 11–12. According to CPI, Arnold Schwarzenegger's head joined to Big Jim's body is oxymoronic—damaging, even, to Conan's reputation. Mattel argues that "[t]here is no evidence at all that CPI cared about the dimensions of the [Conan doll's] body." In response, CPI points out that Mattel did not show it the hybrid Conan until after the signing of the termination agreement. Which side to believe, and whether Mattel breached the "enhancement clause" quoted above, are questions of fact appropriate for a jury's resolution. On this component of CPI's contract claim, summary judgment is denied.

CPI stands on weaker ground in alleging that Mattel breached four covenants implicit in the license. According to CPI, its license with Mattel imposes the following obligations on Mattel as licensee: first, Mattel must "use reasonable efforts" to "place the endorsement and market the designs of the licensor." CPI's memorandum in opposition to defendant's motion for summary judgment at 32 (citing *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214, 118 N.E. 214 (1917) (Cardozo, J.)). Second, CPI argues, Mattel may "not circumvent the licensing agreement by developing a new work based upon the licensed work or based upon the same idea, theme, or title, even if a stranger could create such a new work without infringing the grantor's copyright." *Id.* at 33 (citing *SAS Inst., Inc. v. S & H Computer Sys., Inc.,* 605 F.Supp. 816, 827–28 (M.D.Tenn. 1985) (quoting 3 M. Nimmer, *The Law of Copyright* § 10.11[B] (1983))). Third, CPI

claims that Mattel must fulfill the "duty of good faith which is implied in every contract," *id.* at 34 (citing *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.,* 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329, *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)), a duty that obliges Mattel "to protect the license so as not to reduce the value of the underlying work." *Id.* at 35 (citing *Manners v. Morosco,* 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590 (1920)).

As the Second Circuit recently noted, hornbook contract law holds that a court "will generally not imply a term in the face of the parties' expressed intent to the contrary." *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 46 (2d Cir.1988) (quoting Hadjiyannakis, "The Parol Evidence Rule and Implied Terms: The Sounds of Silence," 54 *Fordham L. Rev.* 35, 38 n. 22 (1985)); *see Lady Duff–Gordon, supra,* 222 N.Y. at 91, 118 N.E. at 214; Restatement (Second) of Contracts § 204 comment d (1981). The license included the following provision:

> [CPI] agrees and acknowledges that toy figures and accessories based upon or appearing to be ancient characters or futuristic characters or combinations thereof from various time periods with which articles are or may be competitive have been and will be produced and sold and may hereafter be created, designed, produced and sold by [Mattel] (collectively referred herein as "Related Toy Line") without incurring liability to [CPI] under this Agreement.

Thus, the parties agree that nothing in this agreement shall be construed or interpreted

> (a) to require elimination of or preclude any Related Toy Line;

.     .     .     .     .

> (c) to place [Mattel] in breach or default of any provision of this agreement, including the obligation of diligence, by reason of [Mattel's] engaging in any business activity in a Related Toy Line;

.     .     .     .     .

(e) to in any way serve to limit, restrict or impose conditions upon or in any way abridge [Mattel's] independent business judgment in connection with manufacture or marketing ... of any Related Toy Line.

*License, supra,* ¶ 10(d), at 17–18.

During his deposition, Alpert admitted, if grudgingly, that the Masters of the Universe, He–Man's family, fit the Related Toy Line clause. Alpert deposition, *supra,* at 484–85. Alpert's concession merely reinforces the obvious: CPI expressly acknowledged that He–Man existed when the parties signed the license, and notwithstanding CPI's wishes, Mattel had no intention of giving He–Man up. The Related Toy Line clause thus "provides powerful support for the [Mattel's] position that it had no obligation to exploit" the license. *Eastern Elec., Inc. v. The Seeburg Corp.,* 427 F.2d 23, 26 (2d Cir.1970) (covenant implied in *Lady Duff–Gordon* not read into contract "explicitly recogniz[ing] that [licensee] could deal in machines not covered by the ... patents and that [licensor] would not be paid for such sales").[19] The same logic disposes of CPI's second covenant; given the clear language of ¶ 10(d), Mattel did not circumvent its license to market Conan when it continued to work on He–Man—which had already been designed by July, 1981. *Cf. SAS Inst., Inc. v. S & H Computer Sys. Inc., supra,* 605 F.Supp. at 828 (duty not to circumvent license violated when computer software company used another's "proprietary ... materials"). Finally, as the Court of Appeals stated in *Van Valkenburgh,* the covenant of good faith, implied in every contract, does not limit licensees "in their usual business enterprise to the promotion of the licensor's product, absent specific agreement to this effect; and an agreement to use due diligence or best efforts does not alone limit their activity to the licensor's interests." 30 N.Y.2d at 45, 281 N.E.2d at 145, 330 N.Y.S.2d at 333; *see id.* (citing cases); *cf. Manners v. Morosco,* 252 U.S. 317, 326, 40 S.Ct. 335, 336, 64 L.Ed. 590 (1920) (in con-

tract granting right to produce play, but lacking provision analogous to Related Toy Line clause above, " 'there is an implied negative covenant on the part of the [grantor] not to use the ungranted portion of the copyright ... to the detriment, if not destruction, of the licensees' '') (quoting *Harper Bros. v. Klaw,* 232 F. 609, 613 (S.D.N.Y.1916)). Because CPI's arguments here are legally deficient, on these components of its contract claim Mattel's motion for summary judgment is granted.

■■■ CPI also charges Mattel with breaching the agreement that terminated the license. That contract was embodied in a letter from A. Sidney Alpert to Joe Morrison dated April 14, 1982, and it provided as follows:

1. Conan Licensing Company (CLC) and Mattel agree to terminate the License Agreement, effective as of the date your obligations set forth in paragraphs 1.b) and 2. are fulfilled. Upon such termination, we each release the other from all obligations in connection with such License Agreement, except that:

   a) CLC shall retain the sum of Twenty Five Thousand ($25,000.00) [Dollars] previously paid to CLC by Mattel as an advance against royalties; and

   b) Mattel shall pay to CLC the additional sum of Twenty Five Thousand ($25,000.00) Dollars, to be paid immediately upon the execution hereof in full settlement of all obligations under said License Agreement.

2. Mattel shall deliver to CLC ... within ten (10) days ..., and gives to CLC the full, exclusive and paid-up right to use, all materials created and/or developed by Mattel, specifically for use in connection with products under said License Agreement. Mattel represents that the only existing materials of that type consist of wax sculptures.

Termination agreement between Conan Licensing Co. and Mattel, Inc. at 1 (Apr. 14,

---

**19.** *See also id.* ("contract does indicate that Seeburg had the right to sell electrical cigarette vending machines of its own invention"; "infer-

ence that this negates an implied obligation to exploit the Eastern patents is strong").

1982). Although it did pay CPI the additional $25,000, Mattel did not return all the molds, sketches, and other artwork that it had prepared for its Conan line; Mattel provided CPI with but one specimen of each of the heads of Conan, and Thulsa Doom and Rexor, Conan's colleagues. According to CPI, given "today's climate of public concern about corporate dishonesty," considerations of "fundamental fairness and equity" demand that the Court award CPI the rights to He–Man to remedy Mattel's breach. CPI's memorandum in opposition to defendant's motion for summary judgment at 40. Mattel argues in response that its breach was trifling, and that unless a breach is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract," recision is inappropriate. *Callanan v. Keeseville, Ausable Chasm & Lake Champlain R.R.*, 199 N.Y. 268, 284, 92 N.E. 747 (1910); *see Babylon Assocs. v. County of Suffolk*, 101 A.D.2d 207, 475 N.Y.S.2d 869 (1984).

There is no issue of fact here, since Mattel admits that it breached the termination agreement. Summary judgment is inappropriate, however, for Mattel's argument fails as a matter of law. The termination agreement is, as CPI correctly characterizes it, an executory accord within the meaning of N.Y.Gen.Oblig.Law § 15–501(1) (McKinney 1988).[20] Without distinguishing between degrees of culpability, the New York statute provides that "[i]f an executory accord is not performed according to its terms by one party, the other party shall be entitled either to assert his rights under the ... contract, ... or to assert his right under the accord." *Id.* § 15–501(3). Mattel's motion for summary judgment on this issue is denied.[21]

### V. Fraud

#### A. CPI's Claim for Fraud by Mattel

Not content with simple breach of contract, CPI also charges Mattel with "an overall scheme to defraud."[22] CPI's memorandum in opposition to defendant's motion for summary judgment at 27. First, CPI alleges in its complaint that Mattel signed the license agreement "with the secret intention of preventing or delaying the entry of Conan products into the marketplace and precluding CPI ... from developing, displaying and selling Conan products at the Toy Fair in February 1982." Third amended complaint ¶ 46. Second, CPI alleges that the license agreement "misled [it] into believing that Mattel would make a good faith effort to market Conan toys when in fact it had no intention to do so and were [sic] in fact simultaneously preparing an equivalent or identical He–Man toy which they [sic] intended to market instead of Conan and sell under the He–Man name." *Id.* ¶ 55.[23]

To succeed on both claims, CPI must prove by clear and convincing evidence[24]

---

**20.** "Executory accord ... means an agreement embodying a promise express or implied to accept at some future time a stipulated performance in satisfaction or discharge in whole or in part of any present ... contract, ... and a promise express or implied to render such performance in satisfaction or in discharge of such ... contract...." N.Y.Gen.Oblig.Law § 15–501(1) (McKinney 1988).

**21.** It is clear, however, that CPI, in asking for the profits Mattel has garnered from selling He–Man, *see* Stipulation and order regarding damages evidence (July 16, 1986), seeks relief to which, under the Related Toy Line clause, it is not entitled. Whether CPI is entitled to anything beyond the materials Mattel withheld should be left to trial on the merits.

**22.** *Cf. United States v. Mangan*, 575 F.2d 32, 36 (2d Cir.) (Friendly, J.) (quoting *Reddaway v.*

*Banham*, [1896] A.C. 199, 211), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978).

**23.** In its complaint CPI also charged Mattel with fraud in the making of the termination agreement, but it has abandoned that allegation since.

**24.** New York's choice of law rules, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), compel the application of New York substantive law, *see Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 480 N.E.2d 679, 491 N.Y.S.2d 90 (1985) (law of state having "greatest interest in litigation"); *cf. Accusystems, Inc. v. Honeywell Information Sys., Inc.*, 580 F.Supp. 474, 480 (S.D.N.Y. 1984). New York demands proof of fraud by clear and convincing evidence. *Simcuski v. Saeli*, 44 N.Y.2d 442, 377 N.E.2d 713, 406 N.Y.S.2d 259 (1978).

(1) that [Mattel] made a misrepresentation (2) as to a material fact (3) which was false (4) and known to be false by [Mattel], (5) that was made for the purpose of inducing [CPI] to rely on it, (6) [and] that [CPI] rightfully did so rely (7) in ignorance of its falsity (8) to [its] injury.

*Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir.) (quoting *Brown v. Lockwood,* 76 A.D.2d 721, 432 N.Y.S.2d 186 (1980)), *cert. denied,* 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986); *see D.S. Magazines, Inc. v. Warner Publisher Servs., Inc.,* 640 F.Supp. 1194, 1210 & n. 103 (S.D.N.Y.1986) (Weinfeld, J.) (citing cases); *Chopp v. Welbourne & Purdy Agency, Inc.,* 135 A.D.2d 958, 522 N.Y.S.2d 367 (1987). If CPI fails to show that there is a genuine issue of material fact on any of those eight elements, Mattel's motion should be granted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) ("the inquiry involved in a ruling for summary judgment ... necessarily implicates the substantive evidentiary standard of proof that would apply at a trial on the merits"). Moreover, CPI's last allegation charges Mattel with making contractual promises "with the undisclosed intention not to perform [them]." *Sabo v. Delman,* 3 N.Y.2d 155, 162, 143 N.E.2d 906, 909, 164 N.Y.S.2d 714, 718 (1957). Therefore, "the complaint [cannot] merely allege[ ] ... the non-performance of a contractual obligation ...; 'actionable fraud depends on more than a showing of non-performance,' or a 'mere breach of contract.'" *Sherkate Sahami Khass Rapol (Rapol Constr. Co.) v. Henry R. Jahn & Son, Inc.,* 531 F.Supp. 1048, 1061 (S.D.N.Y.1982) (citations omitted), *modified on other grounds,* 701 F.2d 1049 (2d Cir.1983); and CPI must show that Mattel "had no intention of carrying [its promises] out at the time the promise[s] were made." *Olivieri v. McDonald's Corp.,* 678 F.Supp. 996, 1001 (E.D.N.Y. 1988) (citing cases); *see, e.g., Giblin v. Murphy,* 97 A.D.2d 668, 469 N.Y.S.2d 211 (1983), *aff'd on other grounds,* 73 N.Y.2d 769, 532 N.E.2d 1282, 536 N.Y.S.2d 54 (1988) (per curiam).

In the first prong of its claim CPI argues that Mattel defrauded it by concealing He–Man's existence. In the Related Toy Line clause CPI released Mattel from any liability under the license for potentially competitive toys Mattel had "produced and sold" in the past, and might "create[ ], design[ ], produce[ ] and [sell]" in the future. *License, supra,* ¶ 10(d), at 17. By implication, any toys that had already been created and designed, but not yet produced and sold—a category that included He–Man —would not come under the clause's coverage. However, as Magistrate Dolinger noted in a previous order in this case, "nondisclosure is not tantamount to fraud in the absence of a duty of disclosure." Memorandum and Order, *Conan Properties, Inc. v. Mattel, Inc.,* No. 84 Civ. 5799 (May 13, 1986) (Dolinger, Mag.) [hereinafter *Dolinger order*]; *see also Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) ("Where an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak"); *Callahan v. Callahan,* 127 A.D.2d 298, 300, 514 N.Y.S.2d 819, 821 (1987) ("Nondisclosure is tantamount to an affirmative misrepresentation where a party to a transaction is duty-bound to disclose certain pertinent information"); *Nasaba Corp. v. Harfred Realty Corp.,* 287 N.Y. 290, 295, 39 N.E.2d 243 (1942). In the words of the Second Circuit, "a duty to disclose material facts is [only] triggered: 'first, when the parties enjoy a fiduciary relationship ... and second, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 738–39 (2d Cir.1984) (quoting *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984)); *see also Callahan, supra,* 127 A.D.2d at 300, 514 N.Y.S.2d at 821 (a "duty to disclose may arise where a fiduciary or confidential relationship exists or where a party has superior knowledge not available to the

other"). CPI has not alleged that it negotiated with Mattel at any status other than arms-length. Nor has CPI charged Mattel with possessing "superior knowledge" that with reasonable inquiry CPI could not have discovered. Mattel, in short, had no duty to disclose the existence of the growing He–Man, and CPI cannot on that ground maintain an action for fraud. *See Dolinger order, supra,* at 5; *see also id.* at 5 n.* ("[CPI] has also not shown that the details of Mattel's planned line of competing toys were material, that is, [CPI] has not shown that if it had known of these plans, it would not have granted Mattel the Conan license. Such materiality is, of course, a necessary element of a fraud claim.").

▬▬▬▬ For its second claim of fraud CPI relies on three specific items of evidence. The first is a short memorandum from Tom Kalinske, Mattel's Senior Vice-President of Marketing and Sales, to Joe Morrison, Jack Fox, Pat Feely, and Mark Ellis, dated April 24, 1981, about three months before the license was signed. In the memorandum Kalinske urges his colleagues to "negotiate hard for the license," for

> [i]f the movie becomes popular, (even though it is 'R'), or the TV series becomes reality in late '82, the trade could well react more strongly to the Conan line than the He–Man line or at least be confused as to where their emphasis should be. This could well cause failure of our line. We can't allow this to occur.

"If we get the license," Kalinske continues, "we can easily offer different figures than He–Man (new head sculpting) and either build the line or not as we choose." That comment, according to CPI, evinces Mattel's intent to defraud it.

Earlier in this lawsuit CPI cited the same language in a challenge to Mattel's assertion of the attorney-client privilege. In ruling that CPI had not made out a prima facie case of fraud sufficient to upset Mattel's privilege, Magistrate Dolinger examined the document and rejected CPI's gloss. According to Magistrate Dolinger, the Kalinske memorandum "does not convey the clear impression that Mattel had a fixed

intent, or any intent at all, not to exploit the Conan license. At most it suggests that at the time of the memorandum—before the license agreement was entered into—Mattel was not certain to what extent it would develop a series of Conan figures." *Dolinger order, supra,* at 6–7 (footnote omitted). Kalinske also worried that the Conan film might be too violent or sexually suggestive to merit an R rating from the Motion Picture Association of America, and he proposed that they "discuss how we might deal with that." Magistrate Dolinger noted that

> [t]his [latter] observation is at least consistent with Mattel's version of why it ultimately repudiated the license arrangement. Moreover, it is inconsistent with [CPI's] fraud theory since, if Mattel had a fixed intent not to market the Conan figure, the failure of the Conan film to receive an "R" rating would not have been a problem; rather, it would have been a welcome excuse—as [CPI] claims it was—to back out of the deal at a later date.

*Id.* at 7. This Court agrees with Judge Stanton's conclusion that "Magistrate Dolinger's May 13, 1986 rulings were neither clearly erroneous nor contrary to law." Order, *Conan Properties, Inc. v. Mattel, Inc.,* No. 84 Civ. 5799 (Dec. 3, 1986) (Stanton, J.). The Kalinske memorandum cannot alone sustain CPI's action for fraud.

CPI also relies on testimony submitted by A. Sidney Alpert, in an affidavit dated May 19, 1988. During his negotiations with Mattel, according to Alpert,

> I specifically asked Ron Goldman (an old classmate) negotiating on behalf of Mattel, the meaning of [the] language [in the Related Toy Line clause] and was told that it was simply "lawyer's language." I then asked him whether there was then anything currently under development that fit the "Related Toy Line" definition and he responded "No."

Affidavit of A. Sidney Alpert ¶ 4 (May 19, 1988) [hereinafter Alpert affidavit]. None of CPI's four complaints mentioned Alpert's conversation with Goldman, *cf.* Fed. R.Civ.P. 9(b) ("the circumstances constitut-

ing fraud ... shall be stated with particularity"), and CPI does not explain the omission. Moreover, during Alpert's deposition, taken three years earlier, Mattel's lawyers asked him outright: "[w]hat misrepresentations did Mattel ... make to you?" Alpert then answered: "I didn't say they made any. I said they might have made them depending on what they had in their minds when they signed an agreement that included clauses 10–A, B and C...." Alpert deposition, *supra*, at 513–14. Given Alpert's prior, contradictory deposition testimony, his affidavit—submitted after Mattel had already moved for summary judgment and after the lengthy period for discovery in this case had finally ended—cannot, by itself, raise an issue of fact sufficient to defeat Mattel's motion. *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."); *Whitfield v. Cohen*, 682 F.Supp. 188, 191 (S.D.N.Y.1988); *see also Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462–63 (9th Cir.1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); *cf. Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir.1985).

For its final proof of fraud CPI points to a memorandum from Fred Okun to Glenn Hastings, President of Mattel, dated July 14, 1981. In discussing Mattel's presentation to Toys 'R' Us, a major toy retailer, Okun wrote the following:

V. *Male Action*

A. Presentation of He–Man came across as weak and defensive. Needs more excitement and less of product justification.

B. *We should level with the trade on Conan. If not, we will weaken He–Man.*

Memorandum from Fred Okun to Glenn Hastings (July 14, 1981) (emphasis added). CPI's lawyer, James Rhodes, questioned Okun about the memorandum during Okun's deposition.

Q. ... "We should level with the trade on Conan. If not, we will weaken He–Man."

Now, what did you mean when you stated "We should level with the trade on Conan"?

A. I don't remember.

Q. Second sentence, "If not, we will weaken He–Man." What did you mean when you wrote that?

A. I can't specifically tell you. I don't remember.

Q. Regarding the first sentence, "We should level with the trade on Conan," do you know of anything that Mattel was withholding from the trade regarding their marketing of a Conan character product?

A. No.

....

Q. Okay. So is it your testimony, that when you stated under overall paragraph "V," "Male Action" heading "B," subparagraph, "We should level with the trade on Conan," you do not know what you were saying at this time?

A. Not specifically.

Q. Do you know generally what you were saying? If not, that's a fine answer.

A. Well, let me put it to you this way: if the perception of this line on the part of Toys 'R' Us as a major customer was that the line was weak, there would be no reason in mind for us to move forward with it because it would be a waste of effort.

. . . . .

Q. So, in other words, this could mean that, when you state, "We should level with the trade on Conan," this could mean that Mattel would not go forward with the Conan character product; is that correct?

A. Could mean that.

Q. That, in fact, is what you meant, is it not?

A. I can't tell you specifically.

Q. Can you tell me generally?

A. No.

Q. So aside from that interpretation, you know of no other interpretation?

A. That's correct.

Deposition of Fred Okun at 63–65 (Dec. 4, 1985).

Provided with both the memorandum and the deposition, as well as an opportunity to observe Okun's demeanor on the witness stand, a jury might reasonably infer that Mattel never meant to market a Conan doll. As the Second Circuit recently emphasized, "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985)); *see Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) ("It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised"); *cf. Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988) (although when state of mind is at issue summary judgment "should be used sparingly, [a] plaintiff must nonetheless offer 'concrete evidence from which a reasonable juror could return a verdict in his favor,' and is not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). At oral argument, CPI's lawyer said, "I would like to see Okun here explaining to the jury this whole situation and I think it will fly." Transcript of oral argument, *supra*, at 45. In light of all the evidence so far presented, CPI deserves that chance.

### B. *Mattel's Claim for Fraud by CPI*

■ Mattel argues that CPI's fraudulent inducement to contract took two forms. First, Mattel charges that CPI misrepresented to Mattel that it was seriously negotiating with Mego Toys for the license that Mattel ultimately obtained. And second, Mattel claims that CPI falsely implied that Marvel Comics' animation arm had promised CPI a Saturday morning cartoon series on television. Both representations were contained in a letter from Alpert to Fox,

> designed to introduce [Mattel] to an exceptional idea that has been rising steadily for fifty years. His name is CONAN, and he is about to conquer the marketplace in an explosion of color and adventure.... Any licensed product associated with him and his entourage ... is destined for unprecedented success. Major companies are now committing their dollars for new toy and game products under license. AND, on top of all that, a Saturday morning animated T.V. series is set with Marvel's animation group.

Letter from A. Sidney Alpert to Jack Fox (Mar. 25, 1981).

CPI contends that both representations were true, that in any event neither representation was material, and that even if they were, in fact, material and false, Mattel did not rely on them. To succeed on its counterclaim for fraud, Mattel, of course, must meet the same legal test as CPI does for its claim. *See Cumberland Oil Corp. v. Thropp, supra*, 791 F.2d at 1044 (quoted *supra* p. 367). If Mattel fails to raise a genuine issue of material fact on any of the elements of fraud, summary judgment should be entered against it.

In support of its first theory—that its representations were true—CPI cites the testimony of Larry Bernstein, who in 1981 was Mego's Senior Vice–President for Marketing, and of Alpert and Shapiro, who together conducted the CPI–Mego negotiations. In his affidavit, Bernstein relates, "I ... specifically recall that Mego was very interested in [a] license to make Conan figures at the time and I specifically desired such a license; thus I feel confident stating under oath that the negotiations were very serious." Affidavit of Larry Bernstein ¶ 4 (Jan. 22, 1988). CPI was less confident of the negotiations' ultimate success. The following colloquy took place during Mimi Shapiro's deposition:

Q. Were you trying to convince Mr. Bernstein to take a license under Conan?

A. We were talking about a license under Conan, yes. He was interested.

Q. Was it your goal to have Mego become a licensee?

A. Mego was one of the companies that I was approaching for licensing.

Deposition of Mimi Shapiro at 224 (Mar. 7, 1985). Sidney Alpert's deposition testimony suggests that he viewed the Mego negotiations as a bargaining chip with Mattel.

Q. Did you ever discuss with Mr. Lieberman in the early stages of the desirability of continuing a [preexisting] license with Mego?

A. Yes.

Q. And what was the substance of your conversations with Mr. Lieberman?

A. Generally that it would be a good idea, we felt, to terminate that license.

. . . . .

Q. Were there ever any serious license negotiations between Conan Licensing Company and Mego with respect to rights to make the Conan toy in connection with the Conan the Barbarian movie?

. . . . .

A. As part of an overall strategy of getting them out of the [preexisting] license, yes.

Q. ... Could you explain that?

A. Well, if I were trying to get you to take a particular course of action, I might ask you for some consideration flowing my way that I knew you couldn't pay, in order to influence your final decision.

So in the context of that kind of a negotiation, with an ultimate goal in mind, the answer is yes.

. . . . .

Q. ... [Y]ou just made the terms of the license as a whole unacceptable for Mego?

A. Given their circumstances, I thought that they would be unacceptable.

Q. So Conan Licensing Company never considered Mego as a viable candidate for the license of an action figure toy, under the forthcoming Conan the Barbarian movie, correct?

A. I don't know that we never considered them, but at that time we were negotiating ... given their financial status and the background of some of their people, we would—we were looking for a stronger licensee.

Q. From the point in time that you got involved, from that point forward, you never considered Mego to be a viable candidate, correct?

A. I personally did not consider Mego to be a viable candidate, correct.

Alpert deposition, *supra,* at 27, 32–33, 35; *see also* Deposition of Arthur Lieberman at 91 (Mar. 1, 1985) [hereinafter Lieberman deposition].

CPI's own testimony thus makes apparent that there exists a genuine issue of material fact concerning the putative Mego negotiations. The same holds for the Marvel animation series. CPI claims that at time Alpert wrote to Fox, Marvel had, at least in principle, agreed to produce a Conan cartoon series, and that the statement in the letter was true. *See* Lieberman deposition, *supra,* at 167–69; Alpert deposition, *supra,* at 152–56. Mattel argues that because film producer Edward Pressman retained the "holdback rights" to Conan, CPI could not have granted Marvel the license to produce an animated television series without Pressman's permission—which Pressman did not actually grant until 1984, but which CPI may have thought it had in March, 1981. *See* Alpert deposition, *supra,* at 154; Affidavit of Arthur Lieberman ¶ 4 (May 19, 1988). The crucial issue for determination, therefore, is whether CPI acted in good faith when it told Mattel that it and Marvel had already closed a deal. Given the conflicting evidence, that issue properly belongs before a jury.

CPI similarly fails to show that there is no issue of fact on the other elements of Mattel's claim, materiality and reliance. The April 24, 1981 memorandum reveals that Mattel worried that one of its competitors might preempt it: specifically, Mattel felt that "[w]e can't afford to let Mego have the Conan license...." Kalinske

memorandum, *supra.* In a memorandum dated April 13, 1981 Kalinske wrote, "[g]iven there is a small possibility that Conan will end up as TV series, I'd like to tie-up the property formally." Memorandum from Tom Kalinske to Joe Morrison (Apr. 13, 1981). Both memoranda show that Mattel may well have relied on the Mego deal, the Marvel deal, or both, in deciding to pursue the Conan license. A jury should be permitted to decide.

### VI. Conclusion

For the reasons discussed above, Mattel's motion for summary judgment is granted in part and denied in part, and CPI's motion for summary judgment is denied. CPI's claims for copyright and trademark infringement and for unfair competition and dilution are dismissed. Its claims for breach of contract and fraud survive, as does Mattel's claim for fraud. The parties are each directed further to submit to the Court by June 9, 1989, a list, consistent with this opinion, proposing those "material facts [that] exist without substantial controversy and [those] material facts [that] are actually and in good faith controverted," so that the Court may "thereupon make an order specifying the facts that appear without substantial controversy.... Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly." Fed.R.Civ.P. 56(d). Having chosen to resolve their dispute through non-violent means, Conan and He–Man must now present their cases before a jury of the peers of their creators.

IT IS SO ORDERED.